TEXAS CO. v. INTERNATIONAL & G. N. RY. CO. et al. (two cases). *

(Circuit Court of Appeals, Fifth Circuit.   November 18, 1916.)

Nos. 2924, 2932.

1. RECEIVERS ⬭160—CLAIMS—LABOR AND SUPPLY CLAIMS—PREFERENCES.
   Claims for labor or operating supplies furnished to a railroad company within six months prior to the appointment of receivers in a foreclosure suit are entitled to a preference upon the net income of the receivership, before any of it is paid to the mortgagees or for betterments to the property, although there is no charge of previous diversion of earnings, and regardless of the fact that the mortgage provides for the impounding of the income through a receivership for the benefit of the bondholders.
   [Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 309, 310; Dec. Dig. ⬭160.]

2. RECEIVERS ⬭153—DIVERSION OF INCOME.
   Payment of taxes by receivers of a railroad company out of the net income of the receivership is not a diversion of earnings as against labor and supply claimants, such payment being for the benefit of all parties interested in the property.
   [Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 276, 277; Dec. Dig. ⬭153.]

3. RECEIVERS ⬭159—DIVERSION OF INCOME.
   In a railroad receivership in a suit to foreclose a second mortgage, the court should not as a settled policy divert net earnings of the receivership to the payment of interest on first mortgage bonds, to prevent a default under such mortgage, where the effect is to postpone payment of supply claims, which are entitled to preference from such earnings.
   [Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 307, 308; Dec. Dig. ⬭159.]

---

⬭For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
*Rehearing denied December 18, 1916.

4. RECEIVERS ⟨Key⟩158(2)—CLAIMS—LABOR AND SUPPLY CLAIMS.

Where there are net earnings of a railroad receivership instituted at suit of mortgage bondholders, supply claimants who have a preferential equity therein are entitled to have the same applied to their claims, without waiting the final termination of the receivership, which is not under their control or at their risk, and they have the right to object to the diversion of such earnings to the payment of other obligations inferior in priority to their own.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 303; Dec. Dig. ⟨Key⟩158(2).]

5. RECEIVERS ⟨Key⟩128—CLAIMS—LABOR AND SUPPLY CLAIMS.

A court is not justified in authorizing the issuance of receivers' certificates by a railroad receiver appointed in a foreclosure suit for the making of permanent betterments on the property, not urgently needed to keep it in operation, and making such certificates a first lien on the net earnings of the receivership, to the displacement of supply claims, which are entitled to priority of payment from such earnings.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 205, 210, 219–222; Dec. Dig. ⟨Key⟩128.]

6. APPEAL AND ERROR ⟨Key⟩71(4)—APPEALABLE ORDERS—FINALITY.

Orders of a District Court, made after the entry of a decree foreclosing a railroad mortgage, authorizing the issuance of receivers' certificates and making them a first lien on the net earnings of the receivership, or otherwise disposing of such earnings to the displacement of supply claims, are final orders and appealable.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 399–401; Dec. Dig. ⟨Key⟩71(4).]

7. RECEIVERS ⟨Key⟩150—CLAIMS—SUPPLIES—ENFORCEMENT.

Where, in a suit to foreclose a second mortgage on railroad property to which the first mortgagee was not a party, orders were made directing payment by the receiver of interest on the first mortgage bonds from the net earnings of the receivership, displacing prior claims of supply creditors on such earnings, and remitting them to the corpus of the property, such creditors were entitled to maintain an independent bill, making the trustee in the first mortgage a party, for the protection of their rights, by enjoining such trustee from receiving the payments and requiring him to restore the same, and also for enforcing their claims against the corpus of the property, should it become necessary.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 267, 268; Dec. Dig. ⟨Key⟩150.]

Appeals from the District Court of the United States for the Southern District of Texas; Waller T. Burns, Judge.

Suits in equity by the Central Trust Company against International & Great Northern Railway Company, and by the Texas Company against the International & Great Northern Railway Company and others. From orders entered in each suit, the Texas Company appeals. Reversed.

The appeals in the two cases may be considered together, since the purpose of each is to accomplish the same result, but by different remedies.

Statement as to 2932.

The appeals in cause numbered 2932 are from two orders of the court below, filed April 18, 1916, one authorizing the issue of receivers' certificates in the amount of $1,400,000, and the other authorizing and directing the receiver to pay the interest falling due May 1, 1916, on the bonds secured by the first mortgage on the railroad out of any net income or earnings in his hands at that time, and also from an order denying a rehearing from those orders.

⟨Key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

These orders were made in a suit pending in the District Court, filed August 7, 1914, by the Central Trust Company, as plaintiff, against the International & Great Northern Railway Company, as defendant, to foreclose the lien óf a mortgage, securing an issue of second mortgage bonds, upon the railroad property. On August 10, 1914, receivers were appointed, under this bill and with the consent of the defendant, of the mortgaged property, and authorized to operate the railroad pending final decree in the foreclosure suit, and after qualifying entered upon the discharge of their duties, and they, or the survivor, have continued to operate the railroad up to the time the appeals were allowed. Upon the 4th day of May, 1915, the appellant, the Texas Company, intervened by petition in the foreclosure suit, seeking to have established its claim for material furnished the railroad company during a period of six months prior to the receivership in the amount of $225,778.52, and to have it declared a preferred claim against the net income of the receivership and upon the entire corpus of the mortgaged property. There were other preferred claims of like character, making the aggregate, including that of appellant, the sum of approximately $600,000.

The intervention of the appellant was referred by the court to a special master, who reported on April 7, 1916, that the appellant had, during the six months period prior to the receivership, furnished the railroad company supplies of a preferential character in the amount of $225,778.52, and recommending that the appellant's claim in that sum be allowed and charged as a preferential claim, along with claims of like character, against the net income from the operations of the receiver, as to principal amount, and that interest thereon be allowed as an unsecured claim. Exceptions to the findings of the master were filed by both parties and by the receiver, and were pending and undisposed of when the appeals were allowed. Installments of interest upon the bonds secured by the first mortgage fell due semiannually in May and November, and the mortgage securing these bonds provided for the maturing of the principal upon default in the payment of any interest installment. There had been no default in the payment of interest under the first mortgage at the time the foreclosure suit was filed, and the principal of the first mortgage bonds would not have matured for some years, unless prematurely by a default in the payment of interest. To prevent the premature maturing of the first mortgage bonds by reason of a default in payment of an installment of interest, and upon request of the receivers, the court had ordered the receivers to pay, out of the net income of the operations of the railroad under the receivers, all installments of interest upon the first mortgage which fell due up to and including May 1, 1916, and all such interest had been paid by the receivers out of their net income or money borrowed by them prior to that date, and precipitation of the maturity of the bonds so prevented. On May 17, 1915, a decree of foreclosure and sale of the railroad subject to the lien of the first mortgage, was entered by the District Court, but no sale had been had thereunder up to the time the appeals were allowed. The decree reserved the rights' of interveners for future determination.

Prior to the making of the orders appealed from, the court had authorized, and the receivers had issued and negotiated, receivers' certificates in the amount of $700,000, which were made a charge upon the net earnings of the receivership, and upon the corpus of the property, ahead of the lien of the mortgage sought to be foreclosed. The proceeds of these certificates were used to pay $338,715, interest due May 1, 1915, upon the first mortgage bonds, and $335,000 in improving the railroad property. At least two other installments of interest on the first mortgage bonds of the like amount, one due November 1, 1914, and one due November 1, 1915, had been paid prior to the making of the orders appealed from by the receivers out of the earnings of the receivership. In April, 1916, it appeared that the surviving receiver was out of funds and had a temporary deficit of $22,684. The first mortgage interest, which fell due in May, was generally provided for by borrowed money, while the earnings of the receivership during the fall months more than sufficed to care for the November installment. The amounts, which had been paid by the receivers during the receivership and prior to the making of the orders appealed from, were: For taxes, $409,589.94; for first

mortgage interest, $1,016,145; for equipment, $225,500; for betterments, other than for equipment, $538,062.36. On the 7th day of March, 1916, the District Court ordered the receivers to make no further payments of first mortgage interest from earnings.

On the 18th day of April, 1916, the court, upon the application of the receivers, modified the previous order of March 7, 1916, so as to make it inapplicable to the first mortgage interest falling due May 1, 1916, and upon the same day entered another order, on the application of the plaintiff and with the consent of the receiver, authorizing and directing the receiver to pay this interest out of net income and earnings, which the order recited would be in his hands at that time. On the same date, upon application of the receivers, the District Court made an order, authorizing the receiver to issue certificates of indebtedness in the sum of $1,400,000, and declaring them, when issued, to be a lien prior to the lien of the bonds secured by the mortgage sought to be foreclosed upon the mortgaged property and all other property then in the possession of the receivers, or which might thereafter come into their possession, and upon the net earnings and income resulting from the conduct of the business by the receivers. The order directed that the proceeds of $700,000 of the certificates should be applied to the payment of $700,000 of receiver's certificates theretofore issued and then outstanding, and which fell due May 1, 1916. The proceeds of any remaining certificates authorized to be issued were to be devoted by the receiver as follows: (1) $200,000 to the construction of shops at San Antonio, Tex.; (2) $155,000 to the acquisition of passenger equipment; and (3) the balance, approximately $345,000, to the ballasting of the tracks of the defendant railroad company. On April 25, 1916, the order of the court, authorizing the issue of receiver's certificates, was modified by an additional order not necessary to set out. On April 26th the appellant, the Texas Company, which had not been heard prior to the granting of the orders recited, filed a motion in the District Court to set aside the three orders mentioned, which motion was by the District Court on April 27, 1916, heard and overruled; the appellant duly excepting.

The appellant thereupon perfected its appeals: (1) From the order of April 18, 1916, authorizing and directing the receiver to pay out of net income and earnings in the hands of the receiver on or before May 1, 1916, the interest due on the first mortgage bonds on that date, amounting to $338,715; (2) from the order of April 18, 1916, as modified by the order of April 29th, authorizing the issuance of receiver's certificates to the amount of $1,400,000, so far as the same decreed and constituted that such certificates be secured by lien upon the net earnings and income resulting from the conduct of the business by the receiver in the operation of the railroad and other property; and (3) from the order of April 27, 1916, refusing to set aside the two orders of April 18, 1916, hereinabove mentioned, and refusing to grant appellant an injunction against such appropriation of earnings of the receivership. No complaint is now made by appellant based on payments of first mortgage interest made before May 1, 1916, nor on the issue of the $700,000 of receiver's certificates, which were to be issued to take up a prior issue in equal amount. This constitutes the subject-matter of the appeal in 2932.

Statement as to 2924.

On May 4, 1915, the appellant, the Texas Company, which was the intervener in the foreclosure suit, in which the orders were made from which an appeal was taken by it in 2932, filed its bill of complaint on the equity side of the District Court of the United States for the Southern District of Texas, making the defendant in the foreclosure suit a defendant and joining with it, as codefendants, the Central Trust Company, the plaintiff in the foreclosure suit, the receivers appointed in that suit, and the Equitable Trust Company of New York, which was the trustee under the trust deed securing the first mortgage bonds of the defendant railroad company. The bill recites the proceedings in the foreclosure suit and its intervention therein; reasserts the claim of appellant and its priority; alleges the payments of first mortgage interest and for betterments made by the receivers, the orders of the court directing such payments, and the issuance of certificates; the insolvency of defendant railroad company; the difficulty of intervener's obtaining full re-

lief in the foreclosure suit, in the absence of the defendant the Equitable Trust Company of New York, which was not a party to that suit, but was made a party defendant in the last suit—and prayed (1) that the defendants be enjoined from making further applications of funds coming into the hands of the receivers as earnings, or from pledging the earnings of said railroad to the payment of interest on bonds, or for betterments, or to the payment of taxes; (2) requiring the receivers to show all payments made by them for interest on prior mortgages, betterments, equipment, taxes, or other similar purposes; (3) that plaintiff's claim be adjudicated on final hearing for its full amount, with interest, and to have a preference or priority of payment over all mortgage bonds and other claims, as to the earnings of said receivership and as to the corpus of the property itself, and for the foreclosure of said lien or priority and the sale of the property to that end, and the application of the proceeds to the payment of plaintiff's claim.

The defendants, including the Equitable Trust Company of New York, appeared and answered the bill of complaint. On November 23, 1915, a motion was made by the plaintiff to consolidate the cause with the pending foreclosure suit. No further action was taken in the cause until April 27, 1916, when the plaintiff filed an application for a temporary injunction, restraining the enforcement and further compliance with the orders of the District Court made on April 18, 1916, as modified by the order of April 25, 1916, and restraining the receiver from making any further application of funds in his hands, or that might come into his hands as earnings of the railroad company, to the payment of interest on bonds, or for betterments, or to the payment of taxes, until the claim of the plaintiff, together with interest, was paid in full. The defendants replied to this application of the plaintiff. On April 27, 1916, the District Court entered an order denying the application for the injunction prayed for, and the plaintiff duly excepted thereto. The plaintiff within 30 days appealed from the order denying the injunction, and here assigns error in cause 2924, based upon that order.

Robert A. John, of Houston, Tex., and Amos L. Beaty, of New York City, for appellant.

Wilson, Dabney & King, of Houston, Tex., for appellees International & G. N. Ry. Co. and its receiver.

Albert Rathbone, of New York City, and Jesse Andrews, of Houston, Tex. (Joline, Larkin & Rathbone and Murray, Prentice & Howland, all of New York City, and Baker, Botts, Parker & Garwood, of Houston, Tex., on the brief), for appellees Central Trust Co. of New York and Equitable Trust Co. of New York.

Before PARDEE and WALKER, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge (after stating the facts as above). As stated, the questions presented by the appeal in case 2932, so far as they appertain to the substantive rights of the parties, are identical with those involved in the appeal in cause 2924. The differences relate entirely to the remedies by which the rights asserted are to be worked out. For this reason, the two causes can be well considered in one opinion.

The two general and controlling questions presented by the record in each of the cases, so far as they relate to the substantive rights of the parties to the litigation, are: (1) Whether supply claimants have a priority in payment over the holders of bonds, secured by a mortgage on the corpus and income of a railroad executed before the supplies were furnished, for supplies furnished to a railroad company during a period of six months before the appointment of a receiver for the railroad property, the receiver having been appointed in a pro-

ceeding to foreclose the prior mortgage, out of the net income arising out of the operation of the railroad property by the receiver, as well as from the net income derived from the operation of the railroad property by the railroad company before it was dispossessed of the property by the receivership; and (2) if such priority exists, whether and under what circumstances the court administering the railroad property has the authority, through its receiver, to divert the net earnings of the receivership to the payment of interest on bonds secured by a prior mortgage to that sought to be foreclosed, to prevent a default, or for betterments· of the property, and thereby postpone the payment of supply claims until the sale of the mortgaged property under foreclosure decree, and remit the ʼsupply claimants for payment to the proceeds of the sale of the corpus of the property.

[1] 1. In this case the appellant does' not rely for its asserted priority upon a diversion of the surplus earnings accruing before the receivership for the benefit of the bondholders, thereby leaving supply claims unprovided for. Its priority is claimed to be upon the net· earnings of the receivership only, and upon the idea that the priority applies as well to the net earnings of the receivership as ·to those of the railroad company before the receivers were appointed, and in the absence of any showing of previous diversions. It is conceded by the appellees that a priority in favor of claims for supplies furnished a railroad company to keep it a going concern, within six months before a receivership of the railroad, exists upon the net income of the railroad company arising out of its operation prior to the placing of it in the charge of a receiver. The contention of the appellees is that no such priority extends in favor of such claims to the net income of the receiver derived from the operation of the property by him after his appointment by the court, where there have been no previous diversions. The argument of appellees is that, where the net income from operation is made a part of the security of the mortgage by its terms, it becomes impounded when a receiver in the interest of the bondholders takes possession of and operates the railroad from which the income is derived, as against all claimants, and thereafter for that reason becomes inapplicable to supply or any class of claims other than those secured by the mortgage. As against this contention, the appellant's position is that current supply claims have a priority in equity over prior mortgages for payment out of net earnings, not only those of the mortgagor company earned before the receivership, but also out of the net earnings of the receivership itself, which it is the duty of the court administering the property to respect; i. e., that the priority extends to the continuing income of the railroad property both before and after the receivership.

In order to consider intelligently these contentions, it is necessary to determine the reason assigned by the courts for the allowance of the priority at all. In the case of Fosdick v. Schall, 99 U. S. 235–252, 25 L. Ed. 339, the Supreme Court said:

"The business of all railroad companies is done to a greater or less extent on credit. This credit is longer or shorter, as ,the necessities of the case require; and when companies become pecuniarily embarrassed, it frequently happens that debts for labor, supplies, equipment, and improvements are per-

mitted to accumulate, in order that bonded interest may be paid, and a disastrous foreclosure postponed, if not altogether avoided. In this way the daily and monthly earnings, which ordinarily should go to pay the daily and monthly expenses, are kept from those to whom in equity they belong, and used to pay the mortgage debt. The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements. Every railroad mortgagee, in accepting his security, impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. If for the convenience of the moment something is taken from what may not improperly be called the current debt fund, and put into that which belongs to the mortgage creditors, it certainly is not inequitable for the court, when asked by the mortgagees to take possession of the future income and hold it for their benefit, to require as a condition of such an order that what is due from the earnings to the current debt fund shall be paid by the court from the future current receipts before anything derived from that source goes to the mortgagees. In this way the court will only do what, if a receiver should not be appointed, the company ought itself to do. For, even though the mortgage may in terms give a lien upon profits and income, until possession of the mortgaged premises is actually taken, or something equivalent done, the whole earnings belong the the company and are subject to its control."

That is the original statement of the doctrine and the reason for it. The bondholder, even though his mortgage covers income, has only the right to look for his security to the surplus earnings after payment of the expenses necessary to produce them. The equity of paying the current expenses, essential to produce, and which did in fact produce, the income claimed by the mortgagee, before paying the mortgagee, is certain. The priority of the supply claims extends primarily only to the income from operation. It has no claim upon the corpus, except in case of diversion of earnings to the benefit of the bondholders, when the supply claimant is permitted to resort to the corpus to replace what has been wrongfully diverted from earnings. The claim of the supply creditor on income is, however, primary, and requires no showing of diversion to sustain it. It is only necessary to show that the supplies that were furnished contributed to the creation of the current income, that it is looked to by the creditor, and that there was income in fact received by the railroad company equal in amount to what it currently cost to operate the railroad. There can be no net income until the current expense claims have first been deducted from the receipts of operation, and, as the security of the mortgagee is limited to net income, it follows that it has no equitable claim upon the receipts of operation until the supply creditors, who have contributed to the creation of such receipts, have been paid in full out of them. The equity of the rule lies in the manifest justice of paying those whose labor or material went to create the income which the mortgagee claims as part of his security, before the mortgagee receives it in payment of his debt. If the current expense could be specifically traced to the current income it creates, the application of the rule would be easy and definite. The impossibility of tracing each dollar of expense into the corresponding dollar of income created by it has made it necesssary for the courts to fix an arbitrary period beyond which it will not be presumed that labor and material furnished the railroad will continue to produce income.

This accounts for the arbitrary period of six months fixed by rule of court. It depends upon the assumption that the period over which labor and supplies used by a railroad will continue to contribute to its earnings is a period of not exceeding six months. Under this rule, if a railroad ceased to be operated, upon the appointment of a receiver, supplies and labor, furnished at any time within six months prior thereto, would share in earnings up to the time the receiver was appointed. If operations are continued by the receiver, it would seem proper to assume that labor and supplies furnished the railroad company, during at least some period prior to the receivership, would continue to contribute to create earnings under the receivership; for it is clear that, if the company's operations had not been interrupted by a receivership, such labor and supplies would have entered into future earnings as a creating factor. If the mortgagee is permitted to subject the entire surplus earnings of the receivership to his security, to the exclusion of labor and supply claimants, who furnished the railroad labor and material prior to the receivership, he would be receiving, in part at least, "that which in equity belongs to the whole or a part of the general creditors." He would be receiving as net income what would not be properly net income; the claims of the labor and supply creditors who contributed to its creation not having been deducted from it. He would in that event receive the benefit of the earnings of the receivership, without paying the incidental burden of the expense by which they were created. If there had been no receivership, the supply creditors would receive payment, from the railroad company, out of the same earnings that went to the receiver after his appointment. It is inequitable that the mortgagee should profit in this respect at the expense of supply and labor claimants, through the placing of the mortgaged property in the hands of a receiver. The bondholders also profit by receiving the earnings of the railroad company on hand when the receiver was appointed, as well as earnings earned before the receivership and subsequently collected by the receiver, all of which would have gone to the supply and labor claimants, but for the interruption of the company's operation by the receivership.

The impossibility of tracing the exact extent of the effect of expenditure into the future income of the receivership is no more an argument against the allowance of the priority, or against its equity, than is the same uncertainty with reference to the extent of the effect of expenditure on income before the receivership an argument against the conceded priority of supply and labor creditors as against the income of the company earned before the receivership. It prevailed as to the latter only to limit the time before which the furnishing of supplies or the performance of labor would not entitle the creditor to a priority to six months. If it is to have any effect on the priority of such creditors as against the income of the receivership, it should only be to fix the time after which no priority should be allowed upon the receiver's earnings, and not to deny the priority altogether.

It seems equitable, therefore, that the priority should extend as well to the income of the receivership as to that of the company prior

thereto. We also think that authority as well as reason supports this rule.. Indeed, but for the earnest contention of the appellees to the contrary, we would have considered the question so finally settled by the former decisions of the Supreme Court as to pretermit discussion. The appellees contend that the expression of the rule in the opinions of the Supreme Court in the former cases was obiter, and should be reconsidered by us, and that subsequent cases, cited on appellees' briefs, support the correctness of their position. A re-examination of the cases has failed to convince us, either that the question was not settled by the former decisions of the Supreme Court, or that the later cases relied upon by the appellees are in conflict with the rule as laid down in the former cases. A brief reference to the decided cases is necessary to present our views.

We think the case of Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596, is decisive of the question. In that case the mortgage covered "all the revenues and income," as well as the corpus. Prior to the receivership there had been no diversion of earnings, either "to pay mortgage interest or to put permanent improvements on the property, or to increase the equipment," and there was no net income that came into the hands of the receiver, upon his appointment, from prior operations. There had been diversions from the earnings of the receivership to pay for right of way. The Circuit Court had decreed that the amount diverted from the income of the receivers for the benefit of the bondholders should be restored from the proceeds of the corpus, to pay a creditor who had furnished supplies to the railroad company before the receivership. The Supreme Court sustained the decree. This could only have been upon the theory that the supply creditor had a priority upon the income of the receivership, as against the right of the bondholder to have such income devoted to the payment of interest or for betterments. The resort to the income of the receivership was not permitted for the purpose of replacing what had been wrongfully taken, and for the benefit of the bondholders, from the income of the company earned before the receivership. There was no such diversion, and there was no such income. Resort to the corpus was permitted because, and only because, the income of the receivership had been diverted from the use of the supply creditor to that of the mortgage bondholder. The priority of the supply creditor was therefore necessarily held by the Supreme Court to extend to the income of the receivership, in order for it to have sustained the decree of the Circuit Court. The language of the Supreme Court admits of no other construction than that the priority extends as well to the income of the receivership as to that of the company itself. The court said (111 U. S. 781, 782, 4 Sup. Ct. 677, 28 L. Ed. 596):

"In the present case, as we have seen, the debt of Bowen was for current expenses and payable out of current earnings. It does not appear from anything in the case that there was any other liability on account of current expenses unprovided for when the receiver took possession, and there is nothing whatever to indicate that this debt would not have been paid at maturity from the earnings, if the court had not interfered at the instance of the trustees for the protection of the mortgage creditors. It is said, however, that as no part of the income, before the appointment of the receiver, was used to pay

mortgage interest, or to put permanent improvements on the property, or to increase the equipment, there was no such diversion of the funds belonging in equity to the labor and supply creditors as to make it proper to use the income of the receivership to pay them. The debt due Bowen was incurred to keep the road running, and thus preserve the security of the bond creditors. If the trustees had taken possession under the mortgage, they would have been subjected to similar expenses to do what the company, with their consent and approbation, was doing for them. There is nothing to show that the receiver was appointed because of any misappropriation of the earnings by the company. On the contrary, it is probable, from the fact that the large judgment for the right of way was obtained about the same time the receiver was appointed, that the change of possession was effected to avoid anticipated embarrassments from that cause. But, however that may be, there certainly is no complaint of a diversion by the company of the current earnings from the payment of the current expenses. So far as anything appears on the record, the failure of the company to pay the debt to Bowen was due alone to the fact that the expenses of running the road and preserving the security of the bondholders were greater than the receipts from the business. Under these circumstances, we think the debt was a charge in equity on the continuing income, as well that which came into the hands of the court after the receiver was appointed as that before. When, therefore, the court took the earnings of the receivership and applied them to the payment of the fixed charges on the railroad structures, thus increasing the security of the bondholders at the expense of the labor and supply creditors, there was such a diversion of what is denominated in Fosdick v. Schall the 'current debt fund' as to make it proper to require the mortgagees to pay it back. So far as current expense creditors are concerned, the court should use the income of the receivership in the way the company would have been bound in equity and good conscience to use it, if no change in the possession had been made. This rule is in strict accordance with the decision in Fosdick v. Schall, which we see no reason to modify in any particular."

It is said, however, that the rule was limited to cases in which the trustee under the mortgage had delayed to take possession after default, and so made the company expend money to keep the railroad a going concern, which the bondholders would have had to expend, had they acted promptly. It is true that the delay of the bondholders is recited by the court, as one of many circumstances giving equity to the priority. The language of the court forbids the idea that it was intended to ground the equity upon the laches of the bondholders or to exclude all cases from the rule except those where such delay had intervened. The equity is stated by the court to rest upon the duty of the court, through its receiver, to do what the company would have done:

"That is to say, pay out of what it receives from earnings all the debts which in equity and good conscience, considering the character of the business, are chargeable upon such earnings. In other words, what may properly be termed the debts of the income should be paid from the income, before it is applied in any way to the use of the mortgagees."

This states the ground for the priority, as was done in Fosdick v. Schall, supra. While other circumstances may in individual cases strengthen the equity of the rule, they are unessential to its application.

In the case of V. & A. Coal Co. v. Central R. R., etc., Co., 170 U. S. 355–368, 18 Sup. Ct. 657, 662 (42 L. Ed. 1068), the Supreme Court, referring to the doctrine originated in Fosdick v. Schall, said:

"The dominant feature of the doctrine, as applied in Burnham v. Bowen, is that where expenditures have been made which were essentially necessary to enable the road to be operated as a continuing business, and it was the expectation of the creditors that the indebtedness created would be paid out of current earnings of the company, a superior equity arises in favor of the materialman as against the mortgage bonds in the income arising both before and after the appointment of the receiver from the operation of the property."

And, coming to apply the rule to the facts in that case, the court said (170 U. S. 370, 18 Sup. Ct. 663, 42 L. Ed. 1068):

"The circumstance that it is uncertain, from the terms of the stipulation, whether the expenditures for betterments were made by the receivers under the stockholders' bill, or under the bill filed by the Central Company, or under the trustee's bill for foreclosure, is immaterial. Even though the mortgages securing the bonds provided for the sequestration by foreclosure of the income of the road for the benefit of the bondholders, for reasons already stated, that income until strict foreclosure or a sale of the road was charged with the prior equity of unpaid supply claimants such as those now before the court."

The court decided that the priority applied to the income of the receivership under the foreclosure bill, and that the filing of that bill did not impound the income as against the claims of those who furnished labor or supplies within the six months period. Again (170 U. S. on page 362, 18 Sup. Ct. 660, 42 L. Ed. 1068), the court, after stating that it was contended "that under the prayer for general relief the petitioners were entitled to have their demands allowed as a preferential claim against any surplus income which might arise from the operation of the Central road under the receiver, after payment of the ordinary expenses of operation, or out of the corpus of the estate or the proceeds of the sale thereof, in the event that the income had been diverted by the receivers in expenditures for betterments," said:

"Had the Central Company, through its own officers, operated its line of railway during the period when the coal in question was furnished, it cannot be doubted in the light of the decision in Burnham v. Bowen, 111 U. S. 776 [4 Sup. Ct. 675, 28 L. Ed. 596], that in the event that the company failed to make payment for such coal while a going concern, the indebtedness created upon the appointment of a receiver might properly have been allowed as a charge upon the surplus income arising during the receivership."

And again (170 U. S. on page 365, 18 Sup. Ct. 661, 42 L. Ed. 1068), the court said, after quoting from the cases of Fosdick v. Schall and Burnham v. Bowen:

"It was thus settled that where coal is purchased by a railroad company for use in operating lines of railway owned and controlled by it, in order that they may be continued as a going concern, and where it was the expectation of the parties that the coal was to be paid for out of current earnings, the indebtedness, as between the party furnishing the materials and supplies and the holders of bonds secured by mortgage upon the property, is a charge in equity on the continuing income, as well that which may come into the hands of a court after a receiver has been appointed as that before. It is immaterial in such case, in determining the right to be compensated out of the surplus earnings of the receivership, whether or not during the operation of the railroad by the company there had been a diversion of income for the benefit of the mortgage bondholders, either in payment of interest on mortgage bonds or expenditures for permanent improvements upon the property. Nor is the equity of a current supply claimant in subsequent income arising from the operation of a railroad under the direction of the court affected by the fact that while the company is operating its road its income is misappropriated

and diverted to purposes which do not inure to the benefit of the mortgage bondholders and are foreign to the beneficial maintenance, preservation, and improvement of the property."

We think the excerpts from the opinion in that case show that the Supreme Court decided in it that the priority of supply claimants attached to the continuing income of the company, as well after as before the appointment of a receiver, and regardless of whether there were diversions from such income for the benefit of the mortgagees; such diversions being necessary to the equity only when resort was to the corpus. We also think that the language of the opinion shows that the court considered the rule announced as necessary to the decision of the cause, and that it should not be treated as obiter by this court, in view of the Supreme Court's contrary holding, for any of the reasons advanced by the appellees.

Nor are the cases of Moore v. Donahoo, 217 Fed. 177, 133 C. C. A. 171, C. & A. R. R. Co. v. United States & Mexican Trust Co., 225 Fed. 940, 141 C. C. A. 64, Martin Metal Mfg. Co. v. United States & Mexican Trust Co., 225 Fed. 961, 141 C. C. A. 85, or Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, in conflict with this rule. In all of those cases, the supply creditor sought to resort to the corpus, and it was held that he could only do so by first showing a diversion from current earnings for the benefit of the mortgagees. These cases hold that resort to the corpus can only be had to restore diversion from earnings on which alone the supply creditor had a preference, and so, if there had been no diversion from earnings, there should be no restoration from the corpus. There was no holding in any of them that such a showing was necessary where the resort was to the income of the receiver, as distinguished from the corpus. In the case of Gregg v. Metropolitan Trust Co., the Supreme Court, thus distinguished the two classes of cases (197 U. S. 187, 25 Sup. Ct. 416, 49 L. Ed. 717):

"Cases like Union Trust Co. v. Souther, 107 U. S. 591 [2 Sup. Ct. 295, 27 L. Ed. 488], where the order appointing the receiver authorized him to pay debts for labor or supplies furnished within six months out of income, stand on the special theory which has been developed with regard to income, and afford no authority for a charge on the body of the fund. Fosdick v. Schall, 99 U. S. 235 [25 L. Ed. 339]; Burnham v. Bowen, 111 U. S. 776 [4 Sup. Ct. 675, 28 L. Ed. 596]; Morgan's L. & Texas R. R. & Steamship Co. v. Texas Central Ry., 137 U. S. 171 [11 Sup. Ct. 61, 34 L. Ed. 625]; Va. & Ala. Coal Co. v. Central R. R. & Banking Co., 170 U. S. 355 [18 Sup. Ct. 657, 42 L. Ed. 1068]; Southern Ry. Co. v. Carnegie Steel Co., 176 U. S. 257 [20 Sup. Ct. 347, 44 L. Ed. 458]. It is agreed that the petitioner may have a claim against surplus earnings, if any, in the hands of the receiver, but that question is not before us here."

We conclude that the appellant as a supply creditor was entitled to a preference upon the net income of the receivership before any of it was paid to the mortgagees or for betterments to the property. It follows that the payments made by the receivers out of income to the first mortgage bondholders for interest were diversions of the receiver's earnings, of which the supply claimants, who were entitled to priority of payment out of them, could justly complain. We also conclude that the payments made by the receivers to provide equipment, to bal-

last the road, and to furnish additional terminal facilities, were in the nature of payments for betterments, which did not merely go to preserve or operate the property, but to enhance the security of the mortgage bondholders, and so were diversions of earnings as to supply creditors who were entitled to payment out of them before the mortgage bondholders.

[2] The appellant contends that the amounts paid by the receivers out of income for taxes on the railroad property should be treated as diversions as to supply creditors, upon the idea that taxes are liens upon the corpus, while the preferential claim of supply creditors is only on net income, and that the mortgage bondholders, whose first lien is on the corpus, should be charged with their payment, rather than the supply creditors, whose claim is confined to the net income, and who may resort to the corpus only in case of a diversion of income. Taxes have a preferential right of payment over the claims of mortgagees and preferred creditors of all classes, both as to the income and corpus, and their payment is necessary to the preservation and operation of the property from which the income arises. Failure to pay them might result in the loss of the property to all parties interested in it, including supply creditors, who themselves have an interest in its continued operation. It is necessary that they be paid in order that continued possession in and operation by and continued income to the receivers may result. If there were no operation, and no resulting income, the supply creditors would have no fund to resort to. It is of interest to them, therefore, that taxes be paid out of the receiver's income, in order that more income may be earned and applied to their claims. In determining whether there is net income of the receivership, we think payments for taxes should be allowed the receiver, but not payments on account of first mortgage interest or for betterments.

That the receivers in this cause, under the orders of the District Court, had made payments for account of first mortgage interest and for betterments, prior to the making of the orders appealed from, in excess of the amount of supply claims, is conceded. The appellant complains of none made for either purpose before May 1, 1916. We hold that the payments for first mortgage interest, made by the receiver May 1, 1916, and the issuance and negotiation of certificates of indebtedness for future betterments, declared to be a lien on the net income of the receiver, operated as a wrongful diversion of that income as against the supply creditors including appellant. It is clear that, if the payment for betterments out of the receiver's earnings operated as a diversion against supply creditors, the attempt to fasten a prior lien on the income of the receivership by the issuance of certificates would equally operate as a diversion.

2. The appellees contend, however, that, conceding the diversion, the appellant and other supply creditors are amply protected by the rule which remits them to the corpus, where the income has been diverted, and that in this case there is an ample equity in the corpus for that purpose. The appellees further contend that the court, in the interest of the administration of the property, is clothed with a discretion to authorize its receiver to divert current earnings of the receivership

from payment of preferred claims to that of first mortgage interest, or to provide betterments for the preservation and improvement of the property, though the payment of the claims of supply claimants may thereby be postponed until the sale of the property, and then paid out of the proceeds of the sale. That the court administering the property has a discretion as to the order and time of payment of claims from the funds in the hands of its receiver is certain. That the exercise of the discretion may be the subject of abuse, and so of review on appeal, is also certain. Whether the District Court properly exercised its discretion in authorizing its receiver to pay first mortgage interest and the cost of betterments out of current earnings, thereby postponing payment of the claims of supply creditors until the sale of the property, is the second question presented by the appeal.

[3] (1) And first as to the payment of interest on the prior mortgage: The purpose of the District Court in authorizing the payment of interest on the first mortgage bonds was to prevent a default and the premature maturing of the principal of those bonds, which would have precipitated a foreclosure of the first mortgage on the railroad. As the District Court has a discretion to direct its receiver to apply current earnings to the payment of interest on bonds secured by a prior lien, that would otherwise go to satisfy the claims of supply creditors, the question here, as to the payment of interest, is whether the circumstances justified the exercise of the court's discretion in favor of such payment. The arguments advanced in support of the exercise of the discretion of the District Court are: (a) The necessity of preventing a default upon the first mortgage; (b) that the supply claims were still in litigation, and not in a condition to be presently paid; and (c) that payment of supply claims could be made only out of net income, and the existence of net income was not determinable until the receivership was finally settled.

(a) As the first mortgage bonds might have been declared in default for nonpayment of interest, the protection of the second mortgage bondholders, represented by the plaintiff in the foreclosure suit, required that this interest be paid. That it was to the interest of the plaintiff in that suit and those represented by it that such interest be paid and a default postponed is certain. If no other conflicting interest was adversely affected, the propriety of the payment would admit of only one answer. However, the interest of the supply creditors must be considered. Their claims, if established, within the rule would be entitled to payment out of the net income of the receiver before it could be applied on any mortgage. This preference over the first mortgage made a default in that mortgage a matter of indifference to them. They were not interested in preventing such a default, or in postponing collection of their claim for that purpose. If foreclosure were had under the first mortgage, their claims would be as much entitled to a preferential payment out of the income of the receivership under that foreclosure as under the present receivership. It was a matter of no moment to the supply creditors under which mortgage the railroad was foreclosed, administered, and sold. Their right to immediate payment out of the net income of the

receivership, before any of it was applied to any mortgage, was the same, no matter which mortgage was being foreclosed.

The question is, therefore, how far it was proper for the District Court to subordinate the interest of the supply creditors to that of the second mortgage bondholders. Some latitude in the method of administration must be allowed the court, even to the detriment of the supply claimants. It must be remembered, however, that the nonpayment of the first mortgage interest would not result in the disintegration of the railroad property, or destroy its unity, or remove its administration from those having an interest in it, as would be the result of a failure to pay taxes or mechanics' or materialmen's liens on specific parts of the railroad. Nonpayment of the latter would tend both to disintegrate the property and to take it away from those interested in it. On the other hand, a failure to pay first mortgage interest would but transfer the control of the administration of the property from one class of security holders to another. To prevent a disintegration of the property, all those having an interest in it are concerned. To prevent a transfer or administration from one class of security holders to another is the concern only of the class having present control. The burden of preventing a physical disintegration of the railroad is that of all interested in it. The burden of preventing the foreclosure of a prior lien is entirely that of the subordinate lienholder to whose advantage it will result.

In the instant case, the second mortgage holders are the class interested in preventing a foreclosure of the first mortgage; the supply creditors have no such interest. The duty of financing the payment of interest on the first mortgage bonds was, therefore, that of the second mortgage bondholders, to the exclusion of the supply creditors. The only consideration the court should allow the second mortgage bondholders, as against the supply creditors in this matter, would be with a view of allowing the second mortgage bondholders a reasonable time in which to arrange to finance the payment of first mortgage interest. A single payment of first mortgage interest out of the surplus earnings of the receiver, first applicable to the payment of supply claims, might be justified. A settled policy of diverting the current earnings of the receiver to the payment of first mortgage interest, at the expense of supply creditors, and with the resulting postponement of payment to them till the sale of the property, cannot, we think, be justified. It operates to shift the burden of financing the first mortgage interest from the second mortgage bondholders, who are alone interested in accomplishing it, to the supply creditors, who have no such interest, to the disadvantage of the latter. That disadvantage is patent. The master allowed interest, but not as a preferred claim. Mere loss of interest does not, however, measure the detriment. The financial embarrassment to the supply creditors, resulting from indefinite delay in payment, in cases where the amount is large, is to be considered.

In this case the foreclosure suit was begun in August, 1914, payments of first mortgage interest were made by the receiver out of his earnings, or borrowed money, under orders of the District Court, in

November, 1914, in May, 1915, in November, 1915, and again in May, 1916. The District Judge in March, 1916, entered an order forbidding the receiver from paying any further first mortgage interest from current earnings, which was rescinded at the solicitation of the receiver in April, 1916. A decree of foreclosure and sale was obtained by the plaintiff as early as May, 1915; but no steps to enforce it had been taken up to the time the appeals had been allowed. We think, under these circumstances, the payment of first mortgage interest, which the receiver was directed to make in May, 1916, was made in pursuance of a settled policy, which subordinated the interests of the supply creditor to those of the second mortgage bondholders in the respect mentioned, and which was not justified.

(b) It is contended by appellees that the supply claims have not been established, but are still in litigation, and present payment of them is not, therefore, possible. This would be a good argument, if the complaint was that the court below had refused to direct their immediate payment. It is not an answer to a complaint that the receiver, under the order of the court, was diverting the fund out of which the supply claims should have been paid, when established, so that it would be then unavailable, and the supply creditors consequently remitted to the proceeds of the corpus after a sale of it. This is the complaint which appellant presents by its appeal.

[4] (c) It is also argued that it is not possible to determine whether there will be a net income until the receivership has been finally settled, and that any application of earnings to supply claims before final settlement would be premature for that reason. The fact that earnings had been more than once applied to first mortgage interest shows there had been a net income from operations up to the time of the allowance of the appeals. The duration of the receivership is not controlled by the supply creditors. If a net income has accrued during the 21 months of operation prior to the time the appeals were allowed, equal or in excess of the amount of the preferred claims, it would seem inequitable that loss on the subsequent operations of the receiver should defeat the application of such surplus earnings to preferred claims. The continued operation, not being at the instance of, or for the benefit of, supply creditors, should not be at their risk. Certainly, if the preference or supply creditor is to be restricted to a fixed period after the appointment of the receiver, the period for computing the net income to be devoted to supply claims should be likewise limited. In any event, the argument is not persuasive against the right of the supply creditors to prevent the diversion of earnings, then apparently applicable to their claims, to the payment of obligations inferior in priority to the supply claims. If the then net income of the receiver is not presently applicable to supply claims, it is certainly less applicable to interest on the first mortgage bonds. The appellant does not complain of the receiver's failure to presently pay its claims, but of the receiver's act in paying the first mortgage bondholders what, in equity, will in any event belong to it as against such bondholders. To this complaint it is no adequate reply that perhaps neither may be entitled to be paid out of such fund. The first in

right certainly has an equity to prevent such a diversion of earnings, until it is determined whether they will constitute a net income applicable to the payment of its claim.

The appellees rely upon the case of Lloyd v. Chesapeake, O. & S. R. Co. (C. C.) 65 Fed. 351. In that case the court found that the objection to the application of receiver's earnings to payment of interest on first mortgage bonds came from the first mortgage bondholders, who wished to precipitate a default for purposes of reorganization, and that the supply claimants were objecting, if at all, only because some of them were controlled in the interest of the first mortgage bondholders, and for the same purposes of reorganization. The court found that the only interest, under the facts in that case, that could have been injured by the payment of interest, was the second mortgage bondholders, a minority of whom, as well as the trustee under the mortgage, requested the court to order the payment. The court eliminated the objections of both the majority of the second mortgage bondholders and the supply claimants from its consideration, because it found that both these interests were controlled by, and the objections made in the interest of, two other railroads, who, through ownership of the securities and obligations of the insolvent railroad, were endeavoring to gain control of it by precipitating a default and a foreclosure under the first mortgage. Nor does it appear in that case that a settled policy of deferring the payment of supply claims out of net earnings, in order to pay interest on a prior mortgage, had been pursued. In matters of discretion, each case must be governed largely by its own facts. In this case, the objection is presented in good faith by a supply claimant, in its own interest and without ulterior motive, and a systematic course of diversion covering almost two years is shown.

[5] 2. As to diversions of earnings to provide for betterments: The District Court, by its order of April 18, 1916, authorized the issue of $1,400,000 of receiver's certificates of indebtedness, and made them, when issued, a prior lien "upon the net earnings and income resulting from the conduct of the business of said receiver." The proceeds of $700,000 of the certificates were to be devoted: (1) In the amount of $200,000, for the erection of shops at San Antonio; (2) in the amount of $155,000, for passenger equipment; and (3) the balance, of approximately $345,000, for ballasting the track of the defendant railroad company. The certificates have been issued, and are alleged by appellant to have been negotiated to the second mortgage bondholders. The appellant does not question the propriety of issuing the certificates for the purposes mentioned, and making them a lien on the corpus, ahead of the lien of the second mortgage, but does assail the order, so far as it attempts to confer a prior lien in favor of the certificate holder on the net earnings and income of the receiver. It is clear that the character of the improvements to which the proceeds were to be devoted are in no proper sense expenses of operating or preserving the property, which would be entitled to be considered as a deduction from the gross earnings of the receiver in order to arrive at his net income. If paid for directly out of the receiver's earnings, the amounts paid for such improvements would have constituted di-

versions from current earnings, of which supply creditors could have complained. The lien of supply creditors on the net income of the receiver could not be properly displaced to provide funds for the improvement of the railroad property, which would better the security of the mortgagees, whose liens on the net income of the receiver were inferior to that of the supply creditors. Creating a prior lien on the net earnings of the receivership by the issue of negotiable certificates is as much a diversion as the payment of earnings on account of improvements would be.

The appellees contend that, conceding it to have been a diversion, the supply creditors suffered no injury, since their claim on the net income so diverted would be transferred to the corpus, which was adequate for their protection. We have held that resort to the proceeds of the corpus, upon a sale of the property, is not the equivalent of a claim on current net income, in the sense that the court administering the property is at liberty to so displace the supply creditors' lien on income, on the theory that it is furnishing an equivalent security. There are doubtless occasions, in the interest of the estate, which would justify the diversion of the current earnings of the receiver to urgently needed improvements, remitting the supply creditors to the corpus. We do not think that the building of new shops, the purchasing of steel equipment for a new kind of passenger service, nor an entire rehabilitation of the roadbed to meet new traffic conditions, present such an exigency. The supply creditors have no interest other than to be paid out of net income. In no event can they be benefited by the improvements of the railroad property, except to an extent necessary to keep it in operation, so that a net income may result to the receiver. As they do not share in the reorganization, they are not benefited by the physical rehabilitation of the property. Their security, being limited to the net income of the receiver, is not enhanced by the improvement of the corpus. Diverting earnings, on which they have a primary claim, to the improvement of property, on which they have only a substituted claim, is a method of improving them out of their security without their consent. We do not think that such improvements should be made at the expense of supply claimants, even to the extent of remitting them to the corpus for their security. The cost of such improvements should be borne altogether by those who have a permanent interest in or lien upon the property to be improved. The lien of the receivers' certificates should have been limited to a lien, prior to the lien of the second mortgage bonds, upon the corpus of the mortgaged property, and, so far as it attached to the receiver's net income, subordinate to that of supply claimants.

It is contended that it is too late to change the form of the certificates, since they are negotiable, and the record does not affirmatively show that they have not passed into the hands of innocent purchasers. An inference may be drawn from it that they are held by or in the interest of the second mortgage bondholders. The defense that they are innocently held by purchasers without notice is an affirmative one, which can be presented in the District Court, if the appellees are so advised.

[6] It is contended by appellees that the orders appealed from were not final judgments or decrees, and hence that no appeal lies from them. There had been a decree of foreclosure in the case before the appeals were allowed. The appealability of supplementary orders, affecting the fund or property, entered after final decree in a foreclosure cause, was considered in the case of Farmers' Loan & Trust Co., Petitioner, 129 U. S. 206, 9 Sup. Ct. 265, 32 L. Ed. 656, and it was there held by the Supreme Court that an order of the Circuit Court, in a suit for the foreclosure of a railroad mortgage, entered after final decree, authorizing "the receiver of the mortgaged property to borrow money and issue receivers' certificates therefor, to be a first lien upon it," was "a final decree from which an appeal may be taken to this court." After deciding that the effect of the order was to give the holder of the certificate a prior lien on the mortgaged property, the Supreme Court said (129 U. S. 214, 215, 9 Sup. Ct. 266, 32 L. Ed. 656):

"If this view of the subject be correct, of which we entertain no doubt, the order is a final one. It is a decree fixing upon the property, on which the trust company now has a first lien, another lien of $120,000, and making it paramount to that. It changes the relation of that company to this property, displaces its rights as settled by a decree now pending in this court, and if that decree is affirmed it in effect modifies it, although this court may say that it should stand and be enforced. This order comes within all the elements of finality which we can imagine to belong to a decree of the Circuit Court. It establishes certain rights of the parties, to the injury, as petitioners believe, of their interests in the property."

Answering the contention that the order was discretionary, and for that reason would not support an appeal, the court said (129 U. S. 215, 9 Sup. Ct. 267, 32 L. Ed. 656):

"The question is one which in its nature must be a subject of appeal. Whether the court below can exercise any such power at all, after the case has been removed from its jurisdiction into this court by an appeal, accompanied by a supersedeas, is itself a proper matter for review; and still more, whether, in the exercise of what the court asserts to be its discretionary power, it has invaded established rights of the petitioners in this case, contrary to law, in such manner that they can have no relief, except by an appeal to this court. This is a matter eminently proper to be inquired into upon an appeal from such an order."

The appealability of the order of the District Court authorizing the issue of certificates, and declaring them to be a prior lien upon the net income of the receivership, is within the letter of this decision; the order directing the payment of the first mortgage interest out of the same fund is, we think, clearly within its spirit. The effect of the latter order is the destruction of the fund on which the supply claimants have a preferred claim or lien, and the transfer of their preference or lien to the corpus of the proceeds of its sale. The supply claimants have the right to be heard as to the disposition of the fund out of which they are primarily to be paid, and a disposition of that fund, which operates to exclude their claims from participation in it, is final as to their rights. The fact that they are given a lien upon other property, or another fund, is not important, in view of their claim that

their lien cannot be so transferred without their consent. We think the two orders of April 18th, appealed from, were appealable orders.

[7] The appellees assert that the installments of first mortgage interest payable May 1, 1916, had been in fact paid by the receiver to the Equitable Trust Company, as trustee under the first mortgage, before the appeal from the order directing its payment had been perfected, and that it cannot now be restored, especially by any 'action of the court in a cause to which the Equitable Trust Company is not a party to the record; and this contention brings us to the consideration of the independent bill, filed by the Texas Company, and the order made in it by the District Court, denying the temporary injunction prayed for by the plaintiff, .which is the subject-matter' of the appeal in cause numbered 2924. To this bill the Equitable Trust Company was a party, and appeared and answered in the District Court. The absence of the Equitable Trust Company as a party in the foreclosure suit, as a barrier to an order directing restoration, is therefore unimportant, if restoration should have been ordered in the former suit.

The equity of the independent bill is asserted upon these grounds: First, that restoration of the first mortgage interest paid the Equitable Trust Company May 1, 1916, can only be ordered in a suit in which the Equitable Trust Company was a proper party, and that it was not a proper party to the pending foreclosure suit; second, that the supply claimants were entitled to an order restraining future diversions, as well as those covered by the orders in the foreclosure suit appealed from; third, that the beneficiary of the diversions was a necessary party to any suit asking that they be restrained, and the Equitable Trust Company was the beneficiary; fourth, that the diversion of income of the receivership to the benefit of the first mortgage bondholders, by payments of interest and for betterments which enhanced their security, remitted the supply claimants to a lien on the corpus, ahead of all mortgages, and that the protection of the supply claimants may require a sale for the satisfaction of their claims, free from the lien of all mortgages, which could only be obtained in a suit to which all mortgagees were parties, which was not true of the foreclosure suit.

The second and third grounds are not well founded. The rights of supply creditors as to future diversions of the net income of the receivership to first mortgage interest can be amply protected in the foreclosure suit, by orders forbidding such future diversions, applied for therein. Nor is the trustee under the first mortgage a necessary party to the relief. It has no claim on the net income of the receiver in the pending suit until the supply claims have been satisfied from it. The lien of the first mortgage has not yet attached to the income of the receiver, and will not until it has been impounded by a receivership in the interest of the first mortgage bondholders.

The first and fourth grounds give the bill equity. The right of the supply claimants to a lien on the corpus, ahead of that of the first mortgage, upon a showing that the earnings of the receiver have been diverted to the benefit of the first mortgage bondholders in payment of interest and for betterments, is established. A bill to satisfy such

claims by the sale of the mortgaged railroad, to which all mortgagees were made parties, would contain equity. The intervention of the supply creditors in the foreclosure proceedings under the second mortgage would afford an adequate remedy to them, only if the equity in the property over the first mortgage was ample to satisfy the supply creditors. The record indicates that there is such an equity in this case. However, there is at least a theoretical equity in the independent bill upon this ground. If no other reason for its filing existed, it might be held unnecessary and vexatious.

However, it appears that the first mortgage interest due May 1, 1916, has been paid by the receiver to the Equitable Trust Company, as trustee under the first mortgage, and has been by it passed to its coupon account. From this we infer that the amount so paid has not been distributed to the first mortgage bondholders, but is still in the possession and control of the trust company. We have held that it was wrongfully paid by the receiver to the trust company, and should therefore be restored to the receiver, unless it has been disbursed to the bondholders, and passed beyond the control of the trust company. No order of restoration can be made in the pending foreclosure suit, to which the trustee under the first mortgage is not a party. The independent bill, therefore, has a practical purpose to justify its existence, as well as a theoretical equity. Whether or not the interest installment of May 1, 1916, has so far passed beyond the control of the trust company as that its restitution to the receiver cannot be equitably compelled, can better be determined in the District Court.

It is contended that the prayer of the application for the temporary injunction, which was denied in the District Court, was not broad enough to entitle the plaintiff to a restoration; but the writ was not denied in the court below for that reason, and the supposed defect in the prayer can be remedied, if necessary, in the District Court, when the cause is returned there. The District Court, in its discretion, may also consolidate the two pending causes, when the reason for their continued separate existence ceases.

In cause numbered 2932, the orders appealed from are reversed, with directions to enter an order setting aside the order directing the payment of the first mortgage interest, which fell due May 1, 1916, and to modify the order authorizing the issue of certificates of indebtedness, by subordinating the lien of $700,000 of such certificates of indebtedness, authorized to be issued by the receiver for betterments, so far as it attaches to the net income of the receiver, to the claims of such supply creditors as have or may establish a priority to it. The method of accomplishing this may be left to the District Court, as it will depend upon the status as to the ownership of the certificates.

In cause numbered 2924, the order denying the temporary injunction is reversed, and the cause remanded, with directions to enter an order, in the District Court, enjoining the defendant the Equitable Trust Company to restore to the receiver the amount paid to it by the receiver for interest due on the first mortgage bonds on May 1, 1916, if such sum has been paid to it and is still in its possession or

control, and from receiving such payment if it has not been theretofore made by the receiver.

And to proceed in each cause in further conformity with this opinion.