**MAYOTOWN LUMBER CO. et al. v. NACOGDOCHES GROCERY CO. et al. (No. 530.)**

(Court of Civil Appeals of Texas. Beaumont.
April 14, 1920. Rehearing Denied
May 5, 1920.)

**1. Judgment ⬦678(6) — Supply creditors of receiver were privies to receivership proceeding.**

Supply creditors of the receiver were privies to receivership proceeding, and were affected by the decrees entered in due process of administration of the receivership.

**2. Estoppel ⬦92(3)—Supply creditors of receiver, accepting part payment out of proceeds of sale bound by terms of order of sale.**

Supply creditors of receiver, who accepted part payment of their claims from receiver out of proceeds of sale of the property, were bound by the terms of the order of sale, directing a sale free from the claims of such creditors, and were estopped to assert a claim or lien on such property as against purchaser and his assignee.

**3. Receivers ⬦184—Finding that bondholders acquiesced in appointment of receiver warranted.**

Evidence in action by receiver's supply creditors for payment *held* to sustain finding that bondholders were privies to, acquiesced in, and agreed and consented to the appointment of such receiver, and the operation of the lumber company through such receivership.

---

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. Receivers ⚖️155—Bondholders, by acquiescing in receivership, subject their lien to payment of supply creditors.**

Bondholders, having acquiesced in and agreed and consented to the appointment of such receiver, and the operation of the properties of the company through such receiver, made themselves responsible for the cost of such operation, and their contract lien became subject to the payment of the supply creditors.

**5. Receivers ⚖️178—Failure to make lienors instituting receivership proceeding parties to suit for supplies furnished not fatal.**

In suit for payment for supplies furnished receiver during operation of business by receiver, failure to make the holders of labor liens, who had instituted the receivership proceeding, parties to such action, did not render petition subject to special exception, since, if bondholders, who were joined as defendants, were entitled to contribution from such labor lienholders toward satisfaction of claims for receiver's supplies, they should have asserted such equity, to make such labor lienholders parties to the suit.

**6. Receivers ⚖️168—Independent suit by supply creditors held proper.**

Where bondholders were not parties to receivership proceeding, but acquiesced therein, receiver's supply creditors, in bringing suit for payment, in which bondholders were joined as defendants, properly instituted an independent proceeding, since their equities as against the bondholders could not be adjusted, except by making the bondholders parties thereto.

**7. Evidence ⚖️317(2)—Testimony as to statement by witnesses who heard it not hearsay.**

Testimony as to the making of a statement, by witnesses who heard statement made, *held* not objectionable as hearsay.

**8. Receivers ⚖️184—Evidence held admissible on issue of bondholders being privies to receivership proceeding.**

In action by receiver's supply creditors for payment, testimony as to a statement, made during a creditors' meeting by a person claimed to have represented bondholders, as to superiority of supply creditors' liens, *held* admissible on issue as to whether bondholders were privies to the receivership proceeding.

**9. Estoppel ⚖️92(3)—Supply creditors of receiver, by urging sale, not estopped from suing bondholders.**

If receiver's supply creditors urged receiver to sell the property, and accepted 70 per cent. of their claims out of the proceeds, they would not be estopped to prosecute suit against bondholders, since bondholders should have seen to it that the property brought a sufficient sum to pay off all claims superior to theirs.

**10. Receivers ⚖️142—Sale held to pass title to improvements and additions paid for out of earnings of receivership.**

Receiver's sale under order decreeing the property to be sold free of all liens, except the contract liens, *held* to pass title to all improvements placed on the property by the receiver, and all additions thereto made by him from the net earnings, and to preclude receiver's supply creditors, who did not question sale, and who accepted a part of the proceeds in part payment of claims, from asserting any claim against purchasers based on excess earnings by receiver.

Error from District Court, Nacogdoches County; L. D. Guinn, Judge.

Suit by the Nacogdoches Grocery Company against the Mayotown Lumber Company, the Hilgard Lumber Company, the Bankers' Trust Company, and others, in which the Burrus Mill & Elevator Company and another intervened. Judgment for plaintiff and interveners against defendants other than Bankers' Trust Company, and defendants other than Bankers' Trust Company bring error. Reversed as to two first named defendants; affirmed as to other defendants, with directions.

Hutcheson, Bryan & Dyess, of Houston, for plaintiffs in error.

Geo. H. Matthews, of Nacogdoches, Woods, Barkley & King, of Houston, and S. W. Blount, of Nacogdoches, for defendants in error.

WALKER, J. This suit was instituted by the Nacogdoches Grocery Company in the district court of Nacogdoches county against June C. Harris, as receiver of the Attoyac River Lumber Company, the Bankers' Trust Company, a corporation, the First National Bank of Houston, the Union National Bank of Houston, the Lumberman's National Bank of Houston, the Hilgard Lumber Company, the Mayotown Lumber Company, S. F. Carter, and Louis R. Bryan, trustee, to recover the balance due them for supplies furnished by them to June C. Harris in a receivership proceeding pending in said court, styled Besser et al. v. Attoyac River Lumber Company. Afterwards Burrus Mill & Elevator Company and George E. Dilley & Son intervened, pleading substantially the same facts and asking the same relief sought by the plaintiff. The relation of the different defendants to plaintiff's and interveners' demands will be reflected in the statement of the case.

This case was tried by the court without a jury, and judgment was rendered for plaintiff and interveners for the relief prayed for by them against all the defendants, except the Bankers' Trust Company, which disclaimed any interest in the litigation. From this judgment all the defendants, except the Bankers' Trust Company, have appealed by writ of error, and on their request the trial court filed conclusions of fact and law. The following statement of the case is taken from these conclusions:

On and prior to August 1, 1918, the defendant Attoyac River Lumber Company was incorporated under the laws of the state of

---

⚖️For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Texas, for the purpose of operating a sawmill and planer mill for the manufacture of lumber and to buy such lands and timber as necessary therefor. Its original office and place of business was Mayotown, Nacogdoches county, Tex., where it had its mills, planers, tenant houses, tramroads, and timber. On August 1, 1914, this company was indebted to the defendants Lumberman's National Bank, Union National Bank, and First National Bank in a large sum, aggregating $115,000. On this date the lumber company issued its 300 bonds, of the denomination of $1,000 each, which it secured by a deed of trust on all its property, naming the Bankers' Trust Company as trustee. These bonds were purchased by the bank defendants and defendant S. F. Carter in the following proportions: Lumberman's National Bank, $70,000; Union National Bank, $75,000; First National Bank, $100,000, and S. F. Carter, $55,000. The bank defendants deducted from the amount due for the bonds the several sums due them by the lumber company, and paid the difference in cash to the lumber company. At that time S. F. Carter was president of the Lumberman's National Bank, and he personally guaranteed in writing to the First National Bank and the Union National Bank the payment of the bonds purchased by them, and these two banks looked to Carter individually, as well as to the security held by them, for the payment of the bonds. On the 4th day of January, 1915, on petition of J. J. Besser and three others, who held labor liens to the amount of $1,291.31, which had been fixed against the property of the lumber company, June C. Harris was appointed receiver of said lumber company, and he duly qualified as such receiver on the 6th day of June, 1915, and took possession of all of the properties of the Attoyac River Lumber Company, which plaintiffs in their petition stated to be of the reasonable value of $816,000. Quoting directly from the court's conclusions of fact:

"(7) That under the direction and request of the creditors, including the defendant bondholders, the court had the properties of the lumber company run and operated through the receiver from the date of his qualification as such until the 28th day of April, 1917.

"(8) That upon the question of advisability of appointing a receiver for the lumber company, and of the operation of the properties through such receiver, the defendant bondholders other than S. F. Carter, who acted for himself, left the policy and attitude of the bondholders towards the receivership to the defendant S. F. Carter, who in such regard acted for himself, his bank, and the two other defendant bondholders.

"(9) That the defendant bondholders, while not named as parties in said receivership, were privies to, acquiesced in, and agreed and consented to the appointment of such receiver and the operation of the properties of the lumber company through such receivership."

"(19) That the receiver incurred debts for labor and supplies, machinery, etc., necessary to the successful operation of the properties, balance of which was due and unpaid on May 3, 1917, amounting to approximately $71,000.

"(20) That the plaintiff, Nacogdoches Grocery Company, and intervener George E. Dilley & Sons, and intervener Burrus Mill & Elevator Company, were supply creditors of the receiver, having sold and delivered to him, during the time he was operating the properties, various and sundry goods, wares, and merchandise, necessary to the success and used by the receiver in the operation of the property.

"(21) That on April 28, 1917, the receiver filed his petition, asking permission to sell all the right, title, and interest in the properties of the said lumber company and himself as such receiver, subject to the terms of the deed of trust executed by the lumber company to secure the bonds, stating in said petition that a price sufficient could be obtained to pay the receiver's creditors, which included plaintiff and interveners, in full.

"(22) That on April 28, 1917, the court granted said petition and ordered the receiver to sell all of the right, title, and interest of the lumber company and himself in the properties, subject to the terms of the deed of trust; the order reciting certain liens therein specified, not including the claim of praintiff and interveners.

"(23) That on May 3d the receiver sold and conveyed all of the right, title, and interest of the lumber company in and to said properties, as well as that of himself as such receiver, subject to the terms of said deed of trust, to the defendant Hilgard Lumber Company, for the sum of $62,500 in cash, and sale was approved by the court."

The receiver paid out the proceeds of this sale to his creditors, and none of the parties to this appeal questioned his actions in so doing. The plaintiff and interveners were paid by the receiver about 70 per cent. of their claims, leaving a balance due as follows: Nacogdoches Grocery Company, $3,050.52, with interest to date of judgment, $220.28; George E. Dilley & Son, $348.71, with interest to date of judgment, $24.12; Burrus Mill & Elevator Company, $667.18, with interest to date of judgment, $133.42. All these sums were past due and had not been paid. At the time this suit was instituted, the receiver was entirely without funds with which to pay any part of the balance due on said claims. At the date of the receiver's sale, the bondholders still held the bonds bought by them, except such bonds as had been paid by the receiver.

"(33) That shortly after the conveyance from the receiver to the defendant Hilgard Lumber Company, said defendant sold and conveyed said properties to the defendant Mayotown Lumber Company, under the same terms of its purchase from said receiver, except as to the purchase price.

"(34) That subsequent to the conveyance by the receiver to the defendant Hilgard Lumber Company, said defendant and the defendant Mayotown Lumber Company have cut and manufactured timber so delivered to it by the receiver of the value of $24,972.48, which said

sum said defendants have turned over to the defendant bondholders in proportion to the amount of bonds held by each.

"(35) That since said conveyance by the receiver and the delivery of all the properties, the defendant Hilgard Lumber Company, and its assign, the defendant Mayotown Lumber Company have been operating said mill plant, cutting and manufacturing said timber into lumber, and the defendant Mayotown Lumber Company is still so cutting and manufacturing said timber through the operation of said plant, and propose and will continue so to do until all of the timber is finally cut and manufactured, during which time it purposes and will pay to the defendant bondholders for said timber at the rate of $3 'per thousand."

"(39) That the receiver had not been discharged by order of the court, but that three years had elapsed from the date of his appointment on the 6th day of January, 1918, and that there was no appeal in any litigation at said time between the receiver and any other parties, or in which the receiver was in any manner interested."

After the institution of the original receivership proceeding, the Bankers' Trust Company resigned as trustee for the bondholders, and under the terms of the deed of trust Louis R. Bryan was appointed substitute trustee.

[1, 2] In directing the sale of the property of the Attoyac River Lumber Company, the receiver was ordered to sell it free of all claims or liens, except the deed of trust lien above mentioned, and such purchase money and other contract liens as had not been paid. A sale to the defendant Hilgard Lumber Company, under the terms of this order, for the sum of $62,500, was duly reported and this sale was duly confirmed. As supply creditors of the receiver, plaintiff and interveners were privies to this receivership proceeding, and were affected by the decrees entered in due process of administration of this receivership. Carlisle v. Mercantile Trust Co., 109 Fed. 177, 48 C. C. A. 275, 34 Cyc. 309. They accepted from the receiver large payments on their claims against him from money paid him by the Hilgard Lumber Company. From their relation as supply creditors, and because they accepted these payments from the receiver, they must be held to the terms of the order of sale, as between themselves and Hilgard Lumber Company and Mayotown Lumber Company, and they are now estopped to assert a claim or lien of any kind on the property of the Attoyac Lumber Company, in so far as these two defendants are concerned. The fact that the court ordered the receiver "to sell all of the right, title, and interest of the Attoyac River Lumber Company and of the said receiver in his official capacity in and to all the property, real and personal, of the Attoyac River Lumber Company," would not charge the purchasers with the equities of the plaintiff and interveners, which they are seeking to assert in this case. The order of sale freed this

property of their equities, so far as the purchasers were concerned. Scott v. National Bank, 97 Tex. 47, 75 S. W. 7, 104 Am. St. Rep. 835.

The bondholders were never made parties to the receivership, and under their sixth, seventh, eighth, ninth, and tenth assignments, they vigorously assail the court's eighth and ninth conclusions of fact, which are copied above. To these assignments, appellees reply by making the following statement from the record:

"The witness Louis R. Bryan testified that in January, 1915, he represented Mr. S. F. Carter generally in his personal matters; that he got acquainted with J. S. Besser, plaintiff in the receivership case, at the time of the filing of the petition; likewise becoming acquainted with Messrs. Clements, Dalton & Alford, co-plaintiffs in said cause, and all the plaintiffs in said cause at the same time; that he went to Mayotown to prepare for the filing of the petition; that he filed the claims of all the unsecured or personal creditors in the receivership with the receiver; that he did not collect anything out of the earnings of the receivership in payment for attorney's fees.

"The original petition in the case of Besser et al. v. Attoyac River Lumber Company et al. shows that four employés of that company, holding claims aggregating $1,291.31, applied for and had placed in the hands of a receiver a corporation which, according to their allegations, had total assets of $816,000 and indebtedness of about $460,000.

"The witness J. P. Carter testified that he was the brother of S. F. Carter, and that he suggested to plaintiffs in the receivership cause that they should file suit; that he advised with S. F. Carter as to what had best been done, and that it was agreed that they would be compelled to have a receiver appointed, and that S. F. Carter suggested that he should be an experienced mill man; further, that S. F. Carter and witness attended court at Tyler on hearing of petition for bankruptcy against the Attoyac River Lumber Company, and opposed said petition; that S. F. Carter was president of the Lumberman's National Bank, one of the bondholders. S. F. Carter personally guaranteed the payment of the bonds held by the Union National Bank.

"The witness Dunn testified that the Union National Bank felt all the while that S. F. Carter's guaranty on the bonds afforded ample protection against any possible loss to them.

"S. F. Carter guaranteed the payment of the bonds held by the First National Bank of Houston.

"John T. Scott, president of the First National Bank of Houston, a bondholder, attended one of the meetings of the creditors of the Attoyac River Lumber Company, called after the receivership, and saw Mr. S. F. Carter present at the meeting; that he knew Mr. S. F. Carter's guaranty would protect the bank in the payment of the bonds; that the bank had made no inspection of the properties of the Attoyac River Lumber Company prior to May, 1917, or since.

"The witness S. R. Smith testified that S. F. Carter was present at Tyler, Tex., at the time of the hearing in bankruptcy against the Attoyac River Lumber Company, and doing all he

could to prevent the bankruptcy of the concern and to continue the receivership through the district court; that a settlement with the petitioning creditors in bankruptcy was arranged at a conference in which S. F. Carter participated, favoring .the settlement, and agreed to furnish the money, with which to make it, approximately $3,000; and further that, because of the attitude of the petitioning creditors and their attorneys toward the bonds, the attitude of S. F. Carter was that in bankruptcy the bonds would be the object of assault, and costly and useless litigation, which would be an expense and without profit to the unsecured creditors, and that as the business would not be operated in a bankruptcy court, but would be shut down and sold out, and under the prevailing conditions would not bring enough to pay even the bondholders; whereas, if operated under the receiver and given time, there was a possibility of. paying .off the bonds and wholly or partially paying unsecured debts. It was the attitude of S. F. Carter, as expressed at the conference at Tyler, that the receivership should continue.

"The witness George S. King testified that at the first meeting of the creditors of the Attoyac River Lumber Company there were present, among others, S. F. Carter, President Scott, of the First National Bank, and W. S. Bailey, attorney for the Bankers' Trust Company, trustee in the deed of trust to secure the bonds; that he was told by the vice president of the Union National Bank, Mr. Dunn, and President Scott, of the First National Bank, that they would take no action in the receivership matter at all, but were leaving the matter entirely to Mr. S. F. Carter; that they had his guaranty on the bonds, he was at the meeting, and whatever course he pursued would be satisfactory with them; and that at that meeting of the creditors it was decided that the property should be continued in operation; and further that S. F. Carter stated at a creditors' meeting that those furnishing the receiver supplies would be protected against everybody, and that S. F. Carter was in favor of going on with the operation of the properties, and was the principal spokesman at the second creditors' meeting, at the Rice Hotel, opposing the resignation of the receiver, and agreeing positively that an operation of the properties by the receiver was the very best course for everybody to pursue; and further that S. F. Carter was in favor of doing anything possible to keep the properties out of bankruptcy, was present at the meeting at Tyler for this purpose; and further that, upon taking up with Mr. Dunn and Mr. Scott, of the banks, the matter of waiving interest on the bonds, he was referred back to Mr. S. F. Carter, the position being that, as S. F. Carter was responsible upon the bonds, whatever course he pursued would be satisfactory with them; and further that on the question being raised as to whether parties selling goods to the receiver would be protected as against the bondholders, S. F. Carter stated that certainly the supply men would be paid first.

"The witness John Schmidt testified that S. F. Carter stated that the debts of the receiver will be absolutely safe and a first lien, even above the bonds; that the bondholders would be lenient in every way they could to make the management of the receiver a success and pay out the receiver's debts, etc.; that S. F. Carter

was very much in favor, in fact, as much as any-one, of the continuation of the receivership; and further that S. F. Carter guaranteed the payment to the Commercial Guaranty State Bank of Nacogdoches of a $5,000 note made by the receiver.

"The witness' E. H. Blount testified that the Commercial Guaranty State Bank advanced to the receiver $6,300 on his note, the payment of which was guaranteed by S. F. Carter, and that after the note was paid S. F. Carter wrote the bank that, in view of the fact that note which he had guaranteed had been paid, it would be proper for the letter guaranteeing its payment to be returned to Carter, in order that he might close his files.

"The witness Oscar Matthews testified that at the creditors' meeting of the Attoyac River Lumber Company, S. F. Carter was present each time, and the president of the First National Bank, John T. Scott, was present once, and that no opposition was made on the part of either as to the operation of the properties by the receiver, and further that S. F. Carter was present at a meeting of the creditors in which the general understanding was reached that the creditors of the receiver who furnished supplies would be first paid, and that witness did not hear S. F. Carter make any opposition, or speak contrary to that understanding.

"The witness June C. Harris testified that he was receiver of the Attoyac River Lumber Company, appointed January 4, 1915; that he was invited to Houston to discuss the matter of his appointment; on which trip he saw S. F. Carter, at which he was told that S. F. Carter wanted two receivers and wanted lumbermen, but before he left Houston it was finally concluded between all of the parties that he should be appointed receiver, and that he was under the impression that Mr. Bryan came back with him from Houston, went up to Mayo, and then presented the petition to the court, and further that President Scott, of the First National Bank, Mr. Bailey, of the Bankers' Trust Company, trustee, and S. F. Carter, were present at the first creditors' meeting of the Attoyac River Lumber Company and further that Mr. Bryan and witness prepared the petition for the order of the sale of the properties, and further that President Scott made the statement to witness that, as far as the First National Bank was concerned, they looked to Mr. Carter and would have nothing to do with the matter, and further, that S. F. Carter assisted in finding a purchaser for the properties of the Attoyac River Lumber Company.

"The witness S. W. Blount testified that at the Tyler meeting Mr. Carter's attitude in conjunction with others was to prevent bankruptcy and continue the receivership.

"After the order of October 7, 1916, to the receiver to make no further payment to the Bankers' Trust Company, trustee, or any other creditor, until further order of court, and that he apply all money coming into his hands to current operating expenses and to the indebtedness incurred by him as receiver, it was admitted that no effort was made by the bondholders to foreclose the lien, or take any action in opposition to such order of court.

"S. F. Carter held $55,000 in the bonds of the Attoyac River Lumber Company, and paid therefor $55,000 in money."

The statement of facts in this case contains 197 pages. A large part of it is devoted to this issue. We have read this testimony, and in our judgment the statement made by appellees fairly reflects the testimony offered by them on this issue. As we understand the testimony, the banks deny the statement made by Mr. King as affecting them, and Mr. Carter explains his connection with the receivership as being an effort on his part to help his brothers, who owned practically all the stock of the Attoyac River Lumber Company. As a bondholder, he said he took no part in the receivership proceeding, but as a brother, and in an effort to help the unsecured creditors, he did advise and assist in this proceeding. The most that can be said of the testimony of these witnesses is that they raised an issue of fact against the contention of plaintiff and interveners. This was duly submitted to the court and found against them, as reflected in his seventh, eighth, and ninth conclusions of fact, which we have given above.

[3] Having sustained the trial court's finding that the bondholders "were privies to, acquiesced in, and agreed and consented to the appointment of such receiver and the operation of the lumber company through such receivership," the question arises as to their liability for the unpaid balance due plaintiff and interveners as supply creditors of the receiver. In Houston Ice & Brewing Co. v. Clint, 159 S. W. 412, Chief Justice Fly, in a very able opinion, on which writ of error was denied by the Supreme Court, said:

"If there should be any concert of action, by which one mortgagee had a receiver appointed with the acquiescence of others, all who engaged directly or indirectly in obtaining the receivership might in some respects see the value of their security impaired."

Chief Justice Phillips, of the Supreme Court, in Craver v. Greer, 107 Tex. 356, 179 S. W. 862, said:

"Where a lienholder procures the appointment of a receiver with the power to operate the property, which is subject to his lien, in a continuance of the business to which it is devoted, it is only just that the consequent expenses should take precedence over his lien, since it must be anticipated that such operation will be attended with cost, and possibly in excess of the income. Heisen v. Binz, 147 Ind. 284, 45 N. E. 104. The same rule should be applied to a party who, while not directly the applicant upon whose petition the receiver is appointed, is privy to the action which results in the appointment. But the indebtedness of the receiver has no right of priority over the vested lien of a creditor who neither applied for the receivership nor was a party to its procurement, merely because he is a party to the suit. Metropolitan Trust Co. v. Railroad Co., 103 N. Y. 245, 8 N. E. 488."

[4] These decisions seem to us to be conclusive against the bondholders. Having "acquiesced in and agreed and consented to the appointment of such receiver and the operation of the properties of the lumber company through such receiver," they made themselves responsible for the cost of such operation, and their contract lien became subject to the payment of the supply creditors.

[5] By their first and second assignments of error, appellants complain of the refusal of the court to sustain their special exception to plaintiff's petition, on the ground that the plaintiffs in the original proceeding were necessary parties to this proceeding. No error was committed in overruling this exception. Under the facts of this record, as reflected by this opinion, we are justified in saying that, though they were not formal parties to the original proceeding, they were directly responsible for its institution. Their lien became subject to the payment of the supply creditors. If equity would have required a contribution from the formal plaintiffs in the original proceeding towards the satisfaction of the claims of the plaintiff and interveners in this proceeding, it was the duty of the bondholders, asserting such equity, to make the original plaintiffs parties to this cause, and to ask for such relief as they were entitled to.

[6] As the bondholders were not formal parties to the original proceeding, the equities between them and the plaintiff and interveners were not before the court in any orders made in that cause. Hence, on such an issue, this proceeding was neither a direct nor collateral attack on any judgment entered in that cause. Neither have this plaintiff and these interveners mistaken their rights in instituting this independent proceeding. Doubtless they could have made the bondholders parties to the original proceeding, but this was not required of them. Their equities as against the bondholders could not be adjusted in the original proceeding, except by making the bondholders parties thereto. We think they had the right to seek an adjustment of these equities in an independent cause, if they so desired. We believe we are sustained in this by the judgment of the Circuit Court of Appeals in Texas Co. v. I. & G. N. Ry. Co., 237 Fed. 921, 150 C. C. A. 571, wherein they sustain an independent proceeding instituted by the Texas Company against the trustee for the first lienholders of the railway company.

[7, 8] Matthews, Schmidt, and King, witnesses for plaintiff and interveners, testified as to certain alleged statements made by S. F. Carter in the creditors'. meetings, to the effect that the supply creditors would have liens superior to all other liens. This.

testimony was objected to when offered, on the grounds, first, that it was hearsay; second, that such statements were immaterial and irrelevant; and, third, that they were verbal, and that the bondholders could not be held on such statements, even if made, as being in violation of the statute of frauds. In disposing of these objections, it is sufficient to say, first, that King and Schmidt testified from what they heard Carter say; second, that these statements were admissible on an issue as to the bondholders being privies to the receivership proceeding; and, third, that no liability was adjudged against the bondholders in contravention of the statute of frauds.

[9] If it should be conceded that plaintiff and interveners urged the receiver to sell the property and that they knew that such sale was pending, and were fully advised as to all the details thereof, and under these facts accepted the payment of 70 per cent. of their claims, they would not be estopped to prosecute this suit against the bondholders. Having made themselves ·privies to the original proceeding, their contract lien became subject to the claims of the supply creditors, and certainly a supply creditor could not be prejudiced by urging payment of a past-due claim. The duty rested on the bondholders to see that the property brought a sufficient sum to pay off all claims superior· to theirs.

[10] By their fourteenth, fifteenth, sixteenth, seventeenth, eighteenth, nineteenth, and twentieth assignments, appellants question the conclusions of fact, made by the trial court, that the net earnings of the receivership largely exceeded the amount of the claims of plaintiff and interveners. On these conclusions the trial court rendered judgment against the Mayotown Lumber Company and the Hilgard Lumber Company, subjecting the property in their hands, purchased by them under the receiver's sale, to the payment of plaintiff's and interveners' claims, decreeing an equitable and statutory lien against all such property, and ordering that the same be sold. All these assignments, in so far as they question these conclusions of fact and law, are sustained. In our judgment, these findings are immaterial, and on this record cannot be the basis of a judgment against these defendants. Hence we will not review the testimony on this issue. Even if the conclusions of fact are sustained by the record, it is our construction of the order of sale, in decreeing the property to be sold free of all liens, except the contract liens, that it was the purpose of the court to convert into money all improvements placed on the property by the receiver and all additions thereto made by him from the net earnings. Clearly the court had authority to make such a sale, and the scope of these orders, in the words quoted by us, is broad enough to pass this interest. Then, in so far as plaintiff and· interveners could rely on the earnings from the receivership as a fund from which to satisfy their claims, by the order of sale and the order of the court confirming it, they are relegated to the proceeds of the sale. On this issue, the burden of affirmative action rested on them, and by sitting by and not questioning the sale, and by accepting a part of the proceeds, they are now estopped to assert any claim against any party to this cause based on excess earnings. Railway Co. v. McFadden, 89 Tex. 138, 33 S. W. 853; Kampmann v. Sullivan, 26 Tex. Civ. App. 308, 63 S. W. 173.

From what we have said, it follows that the judgment against the Hilgard Lumber Company and the Mayotown Lumber Company must be reversed, and here rendered in their favor, and it is accordingly so ordered. It is further ordered that Louis R. Bryan, as trustee for the bondholders, pay to the plaintiff and interveners, pro rata, from the first money coming into his hands as such trustee, from this date, the amount of their claims, and that the judgment against the bondholders· and receiver be in all things affirmed. The payment of such judgment, either by the trustee or the bondholders, shall extinguish the judgment of plaintiff and interveners.