### GUARANTY TRUST CO. OF NEW YORK et al. v. ALBIA COAL CO. et al.

### ALBIA COAL CO. et al. v. GUARANTY TRUST CO. OF NEW YORK et al.

Circuit Court of Appeals, Eighth Circuit. November 11, 1929.

Nos. 8319, 8320.

See, also, 33 F.(2d) 512.

Warren S. Carter, of St. Paul, Minn., and Jesse E. Waid, of New York City (Davis, Polk, Wardwell, Gardiner & Reed, of New York City, Davis, Severance & Morgan, of St. Paul, Minn., Edwin S. S. Sunderland and Larkin, Rathbone & Perry, all of New York City, Frederick G. Ingersoll, of St. Paul, Minn., Henry V. Poor and James L. Banks, Jr., both of New York City, Charles S. Kelly, of Chicago, Ill., White & Case, of New York City, Kingman, Cross, Morley & Cant, Norton M. Cross, and Kenneth Taylor, all of Minneapolis, Minn., Jesse E. Waid and Alexander & Green, all of New York City, Doherty, Rumble, Bunn & Butler, of St. Paul, Minn., James H. McIntosh, of New York City, Charles Bunn, of St. Paul, Minn., Geller, Rolston & Blanc, of New York City, Boyesen, Otis, Brill & Faricy, of St. Paul, Minn., Edward H. Blanc, of New York City, James C. Otis, of St. Paul, Minn., and Taylor, Blanc, Capron & Marsh, of New York City, on the brief), for Guaranty Trust Co. and others.

Henry C. Carlson and Mortimer H. Boutelle, both of Minneapolis, Minn. (Fowler, Carlson, Furber & Johnson, Cobb, Hoke, Benson, Krause & Faegre, and Claude G. Krause, all of Minneapolis, Minn., and Washburn, Bailey & Mitchell and Oscar Mitchell, all of Duluth, Minn., on the brief), for Albia Coal Co. and others.

Before VAN VALKENBURGH and COTTERAL, Circuit Judges, and SCOTT, District Judge.

VAN VALKENBURGH, Circuit Judge. July 26, 1923, a receiver of the property of the Minneapolis & St. Louis Railroad Company was appointed in the District Court of the United States for the District of Minnesota at the suit of the Minneapolis Steel & Machinery Company, a creditor, later joined by the Northern Pacific Railway Company as joint complainant. This action was numbered 290. On succeeding dates, the last being May 26, 1925, trustees in six of the several mortgages on various portions of the property of the railroad, by leave of court, brought suits in foreclosure. The railroad was and is insolvent. The first of these foreclosure suits was filed August 20, 1923, by the Guaranty Trust Company of New York as trustee; it was numbered 299, and was for the purpose of foreclosing the refunding and extension mortgage. This suit was consolidated with No. 290. Later the other suits in foreclosure, as filed, were consolidated with Nos. 290 and 299. In the receivership proceeding, creditors generally were directed to file claims. A special master was appointed. Among the creditors filing were the Albia Coal Company et al., appellees in cause No. 8319 and appel-

lants in No. 8320. These creditors, at the hearing, offered evidence to establish the preferred character of their claims, and also the amount of alleged diversions, in order to justify payment out of the corpus of the property, if necessary. The master made an extended detailed report. Exceptions were filed by the mortgage trustees. The court modified the findings of the master, and July 29, 1926, entered an interlocutory order. The report of the master, as modified, was approved and confirmed. In this interlocutory order the tests for determining whether a claim is entitled to preference were thus stated:

"(1) That the consideration for the claim was a current expense of ordinary operation of the railroad, necessarily incurred to keep it a going concern.

"(2) That the claim represents a debt contracted with the expectation. or intention of the parties that it was to be paid out of the current earnings of the railroad.

"(3) That the claim shall have accrued within six months prior to the appointment of the receiver."

The funds from which preferential claims are commonly paid were thus defined:

"(1) Pre-receivership gross operating income taken over or collected by the receiver, less taxes accrued during the pre-receivership period.

"(2) Receivership net operating income.

"(3) If gross operating income earned during six months prior to the receivership has been diverted either before or since the receivership from the payment of current ordinary operating expenses of said six-months period, to the payment of accruing interest on mortgage indebtedness or to capital account expenditure, then funds from some source, even from the corpus of the mortgaged property, if necessary, sufficient in amount to restore the diversions in full or in such lesser extent as will pay the preferential claims.

"(4) If net operating income of the receivership has been diverted from the payment of the ordinary operating expenses incurred during the six-months period prior to the receivership, to the payment of accruing interest on mortgage indebtedness or to capital account expenditure, then funds from some source, even from the corpus of the mortgaged property if necessary, sufficient in amount to restore the diversions in full or in such lesser extent as will pay the preferential claims."

Thus principles were laid down upon which the preferred nature of claims could be determined; but many of such were left for further analysis. The court said:

"It is apparent from what has been thus far said, that the extent to which any preferential claim will be paid depends upon the amount of the funds above indicated which can be made available, and also upon the aggregate amount of the preferential claims. The ratio between these two amounts will, of course, give the percentage of payment.

"In the case at bar neither of these two amounts can be determined with even approximate accuracy at the present time. As to the amount of funds from which payments may be made, the item of net income of the receivership cannot be known, inasmuch as the receivership has not been closed. The special master undertook to investigate the period from the appointment of the receiver, July 26, 1923, to May 1, 1925, but was unable to reach any definite conclusion even as to that period. * * *

"Furthermore, the aggregate amount of preferential claims entitled to participate in the funds is not ascertained. This is because many of the claims have not yet been passed upon by the special master.

"We have then available neither of the elements necessary for a determination of the extent to which preferential claims can be paid. This being the situation, any decree which might be formulated at this time would be incomplete and indefinite, might be misleading, and would not furnish a satisfactory record for review. I have therefore concluded not to attempt to enter any decree at this time, but simply to outline certain suggestions which may be of assistance to the parties and to the special master in their continuation of the inquiries necessary to a determination of facts upon which to base a decree. I shall limit such suggestions to the pre-receivership six-months period of operation. * * *

"Except as indicated in these remarks, the exceptions to the Master's report are overruled, and the report is approved and confirmed; but no specific decree or order will be based thereon at the present time. Later, when the facts warrant, a specific decree or order will be entered, from which appeal can be taken."

Thereafter, on January 19, 1928, the court did enter the decree from which this appeal was taken. In this decree the claims of the Albia Coal Company et al., appellees in No. 8319, and appellants in No. 8320, were fixed at approximately $815,000. It was found that these claimants, in common with all other claimants theretofore or thereafter determined by the court to have a similar preferential status, or entitled to a preference payment pro rata with others having a similar

status, must look to available funds, if any, derived from the following sources:

"(1) Pre-receivership gross operating income taken over or collected by the receiver, less taxes accrued during the pre-receivership six-months period; (2) receivership net operating income; (3) unpledged assets belonging to the company; (4) funds from some source, even from the corpus of the mortgaged property if necessary, sufficient in amount to restore gross operating income of the company which was diverted during the pre-receivership six-months period from the payment of current ordinary operating expenses of said six-months period to the payment of accruing interest on mortgage indebtedness of the company or to capital account expenditure; (5) funds from some source, even from the corpus of the mortgaged property if necessary, sufficient in amount to restore or produce net operating income of the receivership period which shall hereafter be found to have been diverted from the payment of ordinary operating expenses incurred during the pre-receivership six-months period to the payment of accruing interest on mortgage indebtedness of the company or to capital account expenditure; (6) a possible surplus remaining above mortgage indebtedness of the company after a sale of the mortgaged property."

It was further stated that it was not feasible at that time to determine even approximately the amounts of all of the foregoing items; that items 1 and 4 could be determined approximately as shown by the records of the company as of April 30, 1925. The decree sets them forth in the following tables:

### Table A

| | |
|---|---|
| Item 1. Cash on hand.................... | $ 92,133 63 |
| Pre-receivership accounts, collected by receiver, less taxes allocated to the six months prior to the receivership | 335,122 34 |
| Payments of interest on mortgages.... | 923,887 50 |
| Payments principal equipment trusts | 288,908 30 |
| Item 4. Payment interest equipment trusts ................................ | 68,590 09 |
| Diversions. Additions and betterments.. | 102,957 15 |
| Interest government note ($1,382,000)... | 41,460 00 |
| Interest government note ($625,000)..... | 31,797 95 |
| Interest government note ($625,000)..... | 32,568 69 |
| | $1,917,425 65 |

### Table B—Offsets to the Diversions.

| | |
|---|---|
| Unpaid balance—First National Bank..... | $ 48,755 13 |
| Unpaid balance—Northwestern National Bank ..................................... | 70,485 00 |
| Dividends—Hocking Coal Company........ | 80,090 00 |
| Rental—Nonoperating property........... | 60 00 |
| Rental—Railway Transfer Company....... | 151,666 58 |
| | $350,916 71 |

From these tables the total net principal sum of items 1 and 4 is $1,566,508.94.

In his memorandum opinion, filed contemporaneously with this decree, the court, after reciting the features of its order of July 29, 1926, to the effect that it would not attempt to enter any decree at that time, and would limit all suggestions to the pre-receivership six-months' period of operation, said:

"Thus the matter has stood until recently, when the claimants have insisted that they are entitled to have an appealable order entered upon their exceptions to the report of the Special Master. Doubtless they are correct. They are entitled at least to have the status of their claims adjudicated, even though it cannot be determined as yet whether, when, or to what extent those claims will be paid. See City and County of Denver v. Stenger, 295 F. 809, 814 (C. C. A. 8). However, obstacles do exist at present, similar to those which existed at the date of the former order, which prevent a determination of the questions whether, when, or to what extent the group of claims can be paid. The special master, though unusually diligent in considering the multitudinous details of this litigation now before him, has not as yet been able to pass upon the status of all claims submitted to him; so that the total amount of preferential claims is still undetermined. Nor has it been feasible as yet for the special master to revise his estimate of certain items of the 'current expense fund' in accordance with the suggestions contained in the advisory order of July 29, 1926, and to approximate the amount of that fund as of a given date. * * *

"It has been necessary, therefore, to restrict the present order (1) to establishing the preferential status of the claims in question; (2) to indicating the several sources of the 'current expense fund' from which the claims may ultimately be paid; and (3) to determining, at least approximately, the amount of that fund as of the date of the appointment of the Receiver."

The court, while apparently entertaining some doubt as to its propriety, was evidently moved to enter this decree at the insistence of the claimants that they were entitled to have entered an order upon their exceptions to the report of the special master from which they could appeal. The court, after a period approximately of 18 months, finally acceded upon the stated authority of City and County of Denver v. Stenger (C. C. A. 8) 295 F. 809, 813. In that case there was a definite claim for arrearages under a franchise provision, and a prayer for immediate payment of such, and for an order providing for future monthly payments as they matured. The order of the trial court was "that said petition be and the same is hereby denied, and that the petition be and the same is hereby dismissed out of this court at the costs of

the petitioner to be taxed." By that order the preference claimed was definitely denied and the application therefor dismissed finally. The court said:

"As to appellant's claim for preference under any and all circumstances, this determination was final and disposed of valuable rights asserted by appellant. The order was of that finality which entitled appellant to have it reviewed and the appeals for that purpose are not premature."

In the present case the decree from which appeal is taken has, to be sure, assumed the amounts of the respective claims of the Albia Coal Company et al., to which must be added the claims of others in large amounts similarly situated; but to this finding no contention is made by either party to this appeal. The sources from which it is indicated funds may perhaps be secured to pay preferential claims are six in number, from but two of which can be determined, and that only approximately, what the total net principal sum will be. Principles governing the nature of this fund subject to the payment of preferences are announced, but it is repeatedly stated that many conditions exist which make a precise accounting impossible at that time. The decree from which this appeal is taken, therefore, determines not the ultimate claims of the parties hereto, but merely announces a formula for the computation of such claims subject to future contingencies. It is much in the nature of a declaratory or advisory judgment, fixing the status of certain incidents or steps in the determination of ultimate concrete claims, but making no final adjudication as to any. Issue is taken only with respect to the rulings of the court upon the various items in tables A and B, together with their related matters. Such rulings, however, are not of the nature of final judgments or decrees, but are a part of the usual proceedings which ultimately result in such final judgments and decrees.

Opening the door to appellate jurisdiction at successive unfinished stages of controversies cannot be indulged. Such procedure would necessarily result in a prohibitive increase in appeals, with attendant delays in the final disposition of cases in trial courts, and without compensatory benefits. It would lead to the very evils which adherence to the rule requiring finality of adjudication as a condition precedent to appellate jurisdiction is calculated to avoid. It results that both appeal and cross-appeal must be dismissed for want of jurisdiction. By this action, however, the right of the parties to this controversy to question the orders here involved, at a proper and final stage of proceedings upon their respective claims, is neither lost nor affected. Such right is expressly preserved, and the cases are accordingly remanded for further proceedings in harmony with these views.