**In the Matter of the NEW YORK, NEW HAVEN AND HARTFORD RAIL- ROAD COMPANY, Debtor.**

No. 30226.

United States District Court
D. Connecticut.

Aug. 28, 1967.

James Wm. Moore of New Haven, Conn., counsel for the Trustees of the Property of the Principal Debtor.

Robert W. Blanchette, Gen. Counsel, and ˙ Seymour N. Weinstein of New Haven, Conn., for New Haven R. R.

Robert W. Kent, Breed, Abbott & Morgan, New York City, for 4% First Mortgage Bondholders Committee.

Davis Polk Wardwell Sunderland & Kiendl, by Donald N. Dirks, John E. Zuccotti, New York City, for Alco Products, Incorporated.

Simpson Thacher & Bartlett, by Horace J. McAfee, New York City, for Manufacturers Hanover Trust Co. and A. Frederick Keuthen, Trustees of the First and Refunding Mortgage.

John Hunt, Cravath, Swaine & Moore, New York City, for Bethlehem Steel Corp., Westinghouse Electric Corp. and Westinghouse Air Brake Co.

Jerome H. Shapiro, New York City, for The New York Central Railroad Co. and The Pittsburgh & Lake Erie Railroad Co.

Richard McLaren, Carter, Ledyard & Milburn, New York City, for United States Trust Co., Trustee of the Harlem River Division Bonds.

Wilkie Bushby, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, for Chase Manhattan Bank, Trustee for the Debtor's General Income Mortgage.

Charles W. Dibbell, Stoddard, Persky, Eagan & Cobey, New Haven, Conn., for City Products Corporation.

Peter Wilkinson, Robert Berta, Marsh, Day & Calhoun, Bridgeport, Conn., for The Connecticut Coal Co. and Frank McGuire & Son.

John W. Barnett, William J. Egan, Wiggin & Dana, New Haven, Conn., for Humble Oil & Refining Co., Gulf Oil Corp., Shell Oil Corp., T.A.D. Jones & Co., C. W. Blakeslee & Sons, Inc., The United Illuminating Co., Western Union Telegraph Co., Diesel Service, Inc., The Kerite Company, The Fred B. Clark Corp., Arthur Andersen & Co., American Brake Shoe Co., and Wyatt, Inc.

## MEMORANDUM OF DECISION ON PETITION BY SIX MONTHS CREDITORS FOR PRIORITY

ANDERSON, Circuit Judge.

Several unsecured creditors of the New York, New Haven & Hartford Railroad, the Debtor in reorganization, have asserted claims to a priority in the assets of the Debtor based on the so-called "six months rule". For the reasons set forth below, these claims are not entitled to be paid on a priority basis which would have to be satisfied from the corpus [1] of the mortgaged property of the Railroad. Since it appears extremely unlikely that any assets other than corpus will be available after satisfaction of all claims prior to those of the mortgagees, it is unnecessary to make any further determination regarding six months claims at this time.

The "six months rule" was developed in railroad equity receiverships during the late nineteenth century.[2] By 1900 the rule had been stated and applied with sufficient inconsistency to cause the Supreme Court to remark:

"It is apparent from an examination of the above cases that the decision in each one depended upon its special

1. "Corpus" is used throughout this opinion to refer to all property of the Railroad, both real and personal, originally described in the mortgages or which became subject to the liens of the mortgages as soon as the property was acquired; the term does not include cash, receivables and such other current assets which became subject to the mortgages, as a "springing lien", only upon a default.

2. Priorities which would have been granted in an equity receivership are applica-

ble in present-day railroad reorganizations by virtue of § 77(b) of the Bankruptcy Act, 11 U.S.C. § 205(b):

"For all purposes of this section unsecured claims, which would have been entitled to priority if a receiver in equity of the property of the debtor had been appointed by a Federal court on the day of the approval of the petition, shall be entitled to such priority and the holders of such claims shall be treated as a separate class or classes of creditors."

facts. This court has uniformly refrained from laying down any rule as absolutely controlling in every case * * * *."

Southern Railway Co. v. Carnegie Steel Co., 176 U.S. 257, 284–285, 20 S.Ct. 347, 358, 44 L.Ed. 458 (1900). With one exception,[3] the principal decisions on the six months rule since 1900 have been made by lower federal courts,[4] and these decisions have hardly clarified the situation. One court recently commented: ·

"The researches of counsel supplemented by such research as has been at my command have not resulted in the discovery of any principle which would account for all of the decisions or even enough of the decisions so that one might say that there was a principle behind them." [5]

In re Third Avenue Transit Corporation, 138 F.Supp. 623, 625 (S.D.N.Y.1955), aff'd per curiam, 230 F.2d 425, (2 Cir. 1956). In construing the rule at the present time, ambiguities must generally be resolved against those claiming the benefit of the rule:

"The so-called six months' priority rule is an invasion of the established contract rights of lienholders. As an invasion the rule should be strictly contained within narrow confines and limited to the purposes which brought it into being."

Johnson Fare Box Company v. Doyle, 250 F.2d 656, 657 (2 Cir.), cert. denied 357 U.S. 938, 78 S.Ct. 1385, 2 L.Ed.2d 1551 (1958).[6]

In broad terms the six months rule provides that claims for labor, supplies and material furnished to the debtor-railroad shortly before reorganization shall to a certain extent be afforded a priority in the debtor's assets. It has been generally held that certain requirements must be met in order for the rule to apply:

(1) The claim must have accrued within a reasonably short period prior to reorganization (usually six months). Southern Railway Co. v. Carnegie Steel Co., supra, 176 U.S. at 292, 20 S.Ct. 347.

(2) The claim must be for a current expense in the ordinary operation of the railroad necessarily incurred to keep it running. Burnham v. Bowen, 111 U.S. 776, 780, 4 S.Ct. 675, 28 L.Ed. 596 (1884).

(3) The claimant, when furnishing labor, supplies, or material, must have relied on the railroad's current earnings for payment of his claim, and not on the railroad's general credit. Southern Railway Co. v. Carnegie Steel Co., supra 176 U.S. at 285, 20 S.Ct. 347.

Guaranty Trust Co. v. Albia Coal Co., 36 F.2d 34 (8 Cir. 1929); FitzGibbon, The Present Status of the Six Months' Rule, 34 Colum.L.Rev. 230, 235–236 (1934).[7]

The Supreme Court's first statement of the rule, Fosdick v. Schall, 99 U.S. 235, 25 L.Ed. 339 (1879), re-

---

3. Gregg v. Metropolitan Trust Co., 197 U. S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905).

4. The most frequently cited of these is Guaranty Trust Co. v. Albia Coal Co., 36 F.2d 34 (8 Cir. 1929) which is referred to for its dicta because the case merely held that the order before it was not appealable. Second Circuit decisions include Taylor v. Delaware & E. R. Co., 213 F. 622 (2 Cir. 1914); Pennsylvania Steel Co. v. New York City Ry. Co., 216 F. 458 (2 Cir. 1914), 198 F. 721 (1912); Dudley v. Mealey, 147 F.2d 268 (2 Cir.), cert. denied, 325 U.S. 873, 65 S.Ct. 1415, 89 L.Ed. 1991 (1945); In re Third Avenue Transit Corporation, 230 F.2d 425 (2 Cir. 1956), aff'ing 138 F.Supp. 623

(S.D.N.Y.1955); Johnson Fair Box Company v. Doyle, 250 F.2d 656 (2 Cir. 1958); In re Chicago Express, Incorporated, 332 F.2d 276 (2 Cir. 1964).

5. This statement was quoted in excerpted form with approval in Johnson Fare Box Company v. Doyle, 250 F.2d 656, 657 (2 Cir. 1958).

6. Cf. Kneeland v. American Loan & Trust Co. of Boston, 136 U.S. 89, 97–98, 10 S.Ct. 950, 34 L.Ed. 379 (1890).

7. In view of the basis for the present decision it is not necessary to decide now whether any or all of the claims here asserted satisfy any or all of these three requirements.

mains as clear as anything thereafter handed down: [8]

"The business of all railroad companies is done to a greater or less extent on credit. This credit is longer or shorter, as the necessities of the case require; and when companies become pecuniarily embarrassed, it frequently happens that debts for labor, supplies, equipment and improvements are permitted to accumulate, in order that bonded interest may be paid and a disastrous foreclosure postponed, if not altogether avoided. In this way *the daily and monthly earnings,* which ordinarily should go to pay the *daily and monthly expenses,* are kept from those to whom in equity they belong, and used to pay the mortgage debt. The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment and useful improvements. Every railroad mortgagee in accepting his security impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income. If for the convenience of the moment something is taken from what may not improperly be called *the current debt fund,* and put into that which belongs to the mortgage creditors, it certainly is not inequitable for the court, when asked by the mortgagees to take possession of the future income and hold it for their benefit, to require as a condition of such an order that what is due from the earnings to the current debt shall be paid by the court from the future current receipts before anything derived from that source goes to the mortgagees * * *

[I]f it appears in the progress of the cause that bonded interest has been paid, additional equipment provided, or lasting and valuable improvements made out of earnings which ought in equity to have been employed to keep down debts for labor, supplies and the like, it is within the power of the court to use the income of the receivership to discharge obligations which, but for the diversion of funds, would have been paid in the ordinary course of business."

\*  \*  \*  \*  \*  \*

"The power rests upon the fact, that in the administration of the affairs of the company the mortgage creditors have got possession of that which in equity belonged to the whole or a part of the general creditors. Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that if there has been in reality no diversion, there can be no restoration; and that the amount of restoration should be made to depend upon the amount of the diversion." [Emphasis added.]

99 U.S. at 254, 25 L.Ed. 339. The rationale of the rule as stated in Fosdick v. Schall is an equitable distribution of the railroad's operating revenues, to which the Court says the mortgagees "impliedly agree".[9] Revenues accruing from operations should be paid first to the operations creditors whose materials and services made those revenues possible; and only after all such operational claims have been paid, should the bal-

8. Later Supreme Court cases concerned with the six months rule are Burnham v. Bowen, 111 U.S. 776, 4 S.Ct. 675, 28 L. Ed. 596 (1884); St. Louis, A. & T. H. R. R. Co. v. Cleveland, C., C. & I. R. Co., 125 U.S. 658, 8 S.Ct. 1011, 31 L.Ed 832 (1888); Morgan's Louisiana and Texas R. & S. Co. v. Texas Central R. Co., 137 U.S. 171, 11 S.Ct. 61, 34 L.Ed. 625 (1890); Thomas v. Western Car Co., 149 U.S. 95, 13 S.Ct. 824, 37 L.Ed.

663 (1893); Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U.S. 355, 18 S.Ct. 657, 42 L.Ed. 1068 (1898); Southern Railway Co. v. Carnegie Steel Co., 176 U.S. 257, 20 S.Ct. 347, 44 L.Ed. 458 (1900); Gregg v. Metropolitan Trust Co., 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905).

9. This basic concept persists throughout the Supreme Court cases on the six

ance be available for the benefit of the mortgagees. If any operating revenues do improperly get into the hands of the mortgagees, equity requires that those revenues be restored to the operations creditors by the mortgagees yielding them a priority.[10]

The two basic questions raised by the claims presently made are: (1) does the financial history of the New Haven Railroad from January 1, 1961, show that there is presently, in the words of the *Fosdick* case, "a current debt fund" (later referred to as "a current expense fund") out of which the petitioning six months creditors would be entitled to a priority payment; and (2) from what assets, if any, of the Debtor's estate may these priority payments be made?

■ Such a fund may arise out of one or more of the following: (a) current earnings in the sense of surplus earnings during the six months period

and during the reorganization itself; (b) unmortgaged assets of the debtor; and (c) income diverted during the six months period or during the reorganization for the benefit of the mortgagees.

Although most of the Supreme Court cases have used the terms "current receipts" or "current earnings" as a source of this fund, several lower federal courts have used the word "income". See, e. g., Guaranty Trust Co. v. Albia Coal Co., supra. As a result, the New Haven's mortgagees have argued that the fund is equal to the Railroad's "income" or "net income" either as determined by ordinary accrual accounting or by accounting procedures prescribed by the Interstate Commerce Commission for rate-making purposes. The difficulty with this argument is that it fails to take into account the effect of the petition for reorganization. After the petition was filed, many operating expenses which had accrued

months rule. See, e. g., Burnham v. Bowen, 111 U.S. 776, 4 S.Ct. 675, 28 L.Ed. 596 (1884):

"[A]ll parties understanding that current expenses are to be paid out of current earnings" 111 U.S. at 780, 4 S. Ct. at 677.

"All we then [Fosdick v. Schall] decided, and all we now decide, is that if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use." 111 U.S. at 783, 4 S.Ct. at 679. St. Louis, A. & T. H. R. R. Co. v. Cleveland, C., C. & I. R. Co., 125 U.S. 658, 8 S.Ct. 1011, 31 L.Ed. 832 (1888):

"[O]perating expenses * * * are chargeable upon gross income before that net revenue arises which constitutes the fund applicable to the payment of the interest on mortgage bonds." 125 U.S. at 673, 8 S.Ct. at 1017. Southern Railway Co. v. Carnegie Steel Co., 176 U.S. 257, 20 S.Ct. 347, 44 L. Ed. 458 (1900):

"[I]t may be safely affirmed, upon the authority of former decisions, that a railroad mortgagee when accepting his security impliedly agrees that the current debts of a railroad company contracted in the ordinary course of its business shall be paid out of current

receipts before he has any claim upon such income; * * * and that when current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of any funds thus improperly diverted from their primary use." 176 U.S. at 285, 20 S.Ct. at 358.

10. Most cases contain additional rhetoric to the effect that extensions of credit by those furnishing operating services and materials have "kept the railroad running". This continued operation of the railroad is then said to be a benefit to the public and to the mortgagees as well, because the railroad is worth more as a going concern than its liquidation value. Hence a priority should be granted to the operations creditors. However, given the railroad reorganization provisions of § 77 of the Bankruptcy Act (11 U.S.C. § 205), it is simply not true in circumstances like those facing the New Haven that extensions of credit by suppliers of operating materials and services keep a railroad from ceasing to run. Should these suppliers withhold credit and demand cash, the railroad would not go into liquidation; it might have to go into reorganization so much the sooner, but it would keep running until a plan of reorganization was approved or liquidation was decreed.

during the previous six months were not and will not be paid, although the Trustees have been required to pay some of those expenses, and payments of some taxes have simply been deferred by court order. To the extent that expenses merely accrue but are never paid, revenues available for payment to operations creditors are in fact not reduced.

■ The current expense fund available from earnings can be defined, therefore, as the sum of all operating revenues which have accrued during the six months period and in the course of reorganization, and which have actually been received or taken over by the Trustees, less depreciation and all operating expenses which have actually been paid or are payable by the Trustees or which constitute administration expenses.[11]

This definition of the fund differs from that in the frequently cited case of Guaranty Trust Co. v. Albia Coal Co., supra, principally because it provides for the deduction from any gross operating income which accrued during the six months period and *which was taken over or collected by the Trustees,* expenses for items of the accounts payable of the Railroad on July 7, 1961 (the date of the filing of the petition) which the Trustees were required to pay. See FitzGibbon, The Present Status of the Six Months Rule, 34 Colum.L.Rev. 230, 245–246 (1934). The *Guaranty* case treated the fund for the six months period which it defined, as just stated, as "gross operating income taken over or collected by the receiver, less taxes accrued", separately from the fund for the period of the reorganization which it defined as "net operating income". This was apparently done because, as also stated above, many operating expenses which accrued during the six months period go unpaid, whereas those accruing during reorganization are paid as administration expenses. The Supreme Court, however, has generally treated both periods in the

aggregate, for the purpose of the six months rule, as the continuous operation of the railroad. Burnham v. Bowen, supra.

■ Many of the claimants argue, in effect, that, for the purpose of the six months creditors rule, accounting terms cannot be given the meaning accorded them under generally accepted principles or systems of accounting or under those prescribed for railroads by the Interstate Commerce Commission because, they assert, no such recognized accounting method is applicable or even relevant to the rule which is an equitable concept developed by the courts which requires an unorthodox juggling of income and expenses, and current assets and liabilities, to carry out its spirit and its purpose, and, at least in this case, assure the claimants a fund out of which they may be paid. They superimpose upon this idea the claim that, if any time even for the shortest conceivable interval in the six months preceding the filing of the petition in reorganization or in the course of the reorganization itself, such a fund can be said to appear, it is forthwith branded with an equitable lien for the six months creditors and thereafter remains a kind of trust fund which can be used for no other purpose and is finally distributed to the claimants.

Neither of these concepts is tenable. The words used must be interpreted in the light of a generally recognized and accepted system of accounting. The rule, of course, requires the elimination as expenses or liabilities of interest or principal payments and any diversions (more fully discussed infra) to the mortgagees. While a rigid and mechanistic application of accounting terms should not be adopted to thwart the equitable consideration which the courts have afforded six months claimants, such terms, recognized and used for more than half a century, should not be so distorted, for the purpose of granting the six months cred-

---

11. These operating expenses include rents paid, taxes paid, and taxes, the payment of which has been deferred by order of the court. Income, in accounting clas-sifications, for the years 1958 through 1965 is as shown in appendix hereto attached.

itors a recovery, that the terms no longer relate to the concepts for which they have traditionally stood and are no longer descriptive of the Railroad's financial operations. The phrase "generally accepted accounting principles" does not mean precisely the same thing in all businesses because allowances must be made as the Interstate Commerce Commission has said, 309 I.C.C. 289, 293 (1959), "for variations among different industries because of special conditions or long-established usage." As far as this present case is concerned, any difference between the Interstate Commerce Commission's prescribed system of accounting for railroads and "generally accepted accounting principles" is minor and falls within the tolerance which the generally accepted practice allows for the railroad industry. Whatever accounting theories and practices may have been used by the different railroads in the cases which were before the Supreme Court from Fosdick v. Schall, supra, to and including Gregg v. Metropolitan Trust Co., 197 U.S. 183, 188, 25 S.Ct. 415, 49 L.Ed. 717 (1905), it is apparent that the receipts out of which "the current debt fund" or "the current expense fund" may be created is what is referred to in the Gregg case as "the surplus earnings, if any, in the hands of the receiver * * *." See also subsequent lower court decisions, Taylor v. Delaware & E. R. Co., 213 F. 622, 624 (2 Cir. 1914); Texas Co. v. International & G. N. Ry. Co., 237 F. 921, 926–927 (5 Cir. 1916); Moore v. Donahoo, 217 F. 177 (9 Cir. 1914). Cutcheon, Recent Developments in Federal Railroad Foreclosure Procedure in Some Legal Phases of Corporate Financing, Reorganization and Regulation 79 (1931) which says, p. 106, that six months claims

are "preferred over the lien of a mortgage and the claims of bondholders *as to net income, whether that of the railroad company or that of its receivers.*" [Emphasis added.] This description of the rule was quoted as having "very general acceptance" in In re Third Avenue Transit Corporation, supra, and was cited again in In re Chicago Express, Incorporated, 332 F.2d 276, 278 (2 Cir. 1964). See also FitzGibbon, The Present Status of the Six Months Rule, 34 Colum.L.Rev. 230, 243 (1934); Finletter, Bankruptcy Reorganization 377 (1939).

The claimants' argument which in effect would impress a temporary showing at some point from January 1, 1961 to the present of net operating profit with an equitable lien which would remain operative through distribution has been rejected by this Circuit. In re Chicago Express, Incorporated, supra, 332 F.2d at 278. The presence or absence of a fund out of which the six months claimants can be paid must be determined as of the time of distribution and not as of some earlier time such as the moment of the filing of the petition for reorganization or the day on which the Trustees show the greatest earnings from operations.

The Trustees assert that the only fair method of computing income as a source of the fund for the purpose of the six months creditor rule is to take the income which is available for fixed charges. Some of the bondholders object that this formula would unduly benefit the six months claimants because it would include miscellaneous income not generated by the supplies or services furnished by the six months creditors.[12] Perhaps, as they say, net railway operating income

---

12. These claimants have argued that non-operating revenues should be included in the current expense fund; but such a proposition is inconsistent with the rationale of the rule that operations creditors should have a priority in those revenues which they help to produce. New York Dock Co. v. The Poznan, 274 U.S. 117, 121, 47 S.Ct. 482, 71 L.Ed. 955 (1927); In re Chicago Express, Incorporated, 332 F.2d 276, 278 (2 Cir. 1964); FitzGibbon, The Present Status of the Six Months Rule, 34 Colum.L.Rev. 230, 243 (1934). Whether the rentals received from the Grand Central properties are operational or non-operational revenues need not be decided for the purpose of this case because, even if they are considered to be operational, there would still be no surplus earnings for such a fund.

would be a more correct and authoritative well spring for the fund. In any event, it is unnecessary to resolve these conflicting claims here because even if the income available for fixed charges were adopted as the source for the current expense fund, there would, as matters now stand and as they have stood throughout the reorganization proceedings, be no current expense fund.[13]

13. The claimants argue that irrespective of what conclusions may be drawn from the income account, the balance sheet for June 30, 1961 shows current assets of $23,380,423 which were "taken over or collected" by the Trustees which constitutes a fund from which they are entitled to have a priority payment of their claims. The statements of current assets and liabilities both for December 31, 1960 and June 30, 1961 are as follows:

| Current Assets: | | 12/31/60 | 6/30/61 |
|---|---|---|---|
| Cash | | $ 2,394,054 | $ 4,025,567 |
| Special Deposits | | 1,800,533 | 754,154 |
| Net Balance Receivable from Agents and Conductors | | 2,686,173 | 2,631,992 |
| Miscellaneous Accounts Receivable | | 4,416,080 | 3,430,345 |
| Interest and Dividends Receivable | | 60,631 | 64,762 |
| Accrued Accounts Receivable | | 3,221,781 | 3,638,360 |
| Working Fund Advances | | 181,847 | 184,422 |
| Prepayments | | 852,532 | 1,227,998 |
| Material and Supplies | | 7,567,245 | 7,395,599 |
| Other | | 47,345 | 27,224 |
| | Total | $23,228,221 | $23,380.423 |

| Current Liabilities | | 12/31/60 | 6/30/61 |
|---|---|---|---|
| Loans and Notes Payable | | $ 4,500,000 | $13,000,000 |
| Traffic and Car Service Balances | | 5,906,146 | 8,024,680 |
| Audited Accounts and Wages Payable | | 9,476,834 | 10,508,367 |
| Miscellaneous Accounts Payable | | 1,979,429 | 1.810.802 |
| Interest Matured Unpaid | | 2,374,501 | 2,305,531 |
| Dividends Matured Unpaid | | 27,090 | 27,020 |
| Unmatured Interest Accrued | | 258,831 | 316,317 |
| Current Portion of Injuries and Damages Reserves | | 3,825,000 | 3,825,000 |
| Accrued Vacation Pay | | | 4,704,929 |
| Other Accrued Accounts Payable | | 6,576,839 | 6,418,089 |
| Federal Income Taxes Accrued | | 267,594 | 159,000 |
| Other Taxes Accrued | | 6,827,676 | 6,795,352 |
| Other | | 2,752,613 | 1,795,802 |
| | Total | $44,772,553 | $59,690.889 |

If there are subtracted from the current liabilities for June 30, 1961, the loans and notes payable of $13,000,000 and the interest and dividend items amounting to $2,648,868 or a total of $15,648,888, there remain as current liabilities $44,042,001 which exceed the current assets by $20,661,578. Of course as previously mentioned all of these liabilities have not been paid and some never will be paid, but the testimony at the hearing showed and the court finds that all of the current assets were more than off-set by current liabilities totalling substantially in excess of $25,000,000 which the Trustees were required to pay and did pay or which were accrued taxes, payment of which has been deferred by court order. Therefore, nothing has remained in their hands which was "taken over and collected" by them which could constitute a source for a current expense fund. It should be noted that no attempt has been made to give consideration to that portion of the current assets of June 30, 1961 which came from the $8,500,000 borrowed on Government guaranty during the six months period which could not very well qualify under any definition as a source for priority payment of six months creditors' claims.

Moreover, it is highly unlikely that there ever will be one. As there have been no surplus earnings from which a current expense fund could be derived there remains the question whether the priority of the six months claims should be satisfied out of the assets of the Debtor Railroad.

■ The first source for satisfaction of the priority is the unmortgaged assets of the Railroad. Pennsylvania Steel Co. v. New York City Ry. Co., 216 F. 458, 471 (2 Cir. 1914). But the New Haven Railroad has none and the issue then arises to what extent the priority should displace the mortgage liens. These liens generally cover (1) all of the Railroad's property, including that acquired after the initial mortgage, and (2) *once default takes place,* all the Railroad's revenues and certain current assets such as cash and receivables. The former category is universally referred to in the six months cases as the "corpus" of the mortgaged property. The latter category—so-called "springing liens"—directly conflicts with the rationale of the six months rule and the rule effectively displaces these liens to the extent of the claims which come within it.[14] No case has ever questioned that such current assets may be used to satisfy the operations creditor's priority. Non-corpus assets, however, are frequently, as is true in the present case, insufficient for a priority fund, and the critical question then becomes to what extent it may be satisfied out of the corpus of the mortgaged property.

■ On the question of invasion of corpus the Supreme Court has consistently held in every decision on the point that corpus cannot be invaded to satisfy the priority of the operations creditors *except to the extent that the current expense fund has been "diverted" to the benefit of the mortgagees.* See, e. g., Fosdick v. Schall, supra, 99 U.S. at 254, 25 L.Ed. 339 ("[I]f there has been in reality no diversion, there can be no restoration; * * * the amount of restoration should be made to depend upon the amount of the diversion."); St. Louis, A. & T. H. R. R. Co. v. Cleveland, C., C. & I. R. Co., 125 U.S. 658, 674, 8 S.Ct. 1011, 31 L.Ed. 832 (1888); Gregg v. Metropolitan Trust Co., supra.[15] This limiting of corpus invasion to the amount of diversion of the fund is entirely consistent wtih the rationale of

14. In the New Haven's mortgages these springing liens are qualfied by the phrase "to the extent permitted by law".

15. One lower federal court has misread the Supreme Court's holdings on this point. Southern Railway Company v. Flournoy, 301 F.2d 847 (4 Cir. 1962). The *Flournoy* court confused and merged the six months rule with another priority developed in equity receiverships: the so-called "necessity of payment" rule. This rule is completely unrelated to the six months rule, with different requirements and a different rationale. The necessity of payment rule was first enunciated in Miltenberger v. Logansport, C. & S. W. Ry. Co., 106 U.S. 286, 1 S.Ct. 140, 27 L.Ed. 117 (1882); there it was held that if *payment* of a claim which arose prior to reorganization *is necessary for the continued operation of the railroad during reorganization,* (e. g., if a previously unpaid creditor occupies a monopoly position vis-a-vis the railroad during reorganization and threatens to withhold his supplies unless paid) then the trustee is authorized to pay that claim even out of corpus if necessary.

The rationale of the rule is that the interests of all parties, including the public and the mortgagees, are best served by the continued operation of the railroad. Diversion is obviously irrelevant to the necessity of payment rule as are also such requirements of the six months rule as reliance on current earnings and accruing of the claim shortly before reorganization. The *Flournoy* court inexplicably merged the two rules by making necessity of payment a requirement of the six months rule and eliminating diversion as a requirement for corpus invasion. This was directly contrary to Gregg v. Metropolitan Trust Co., 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905), where the Supreme Court in an opinion by Justice Holmes unequivocally held that necessity of payment rule's lack of a diversion requirement for corpus invasion was not to be transposed to the six months rule; the former rule, the Court held, was based on the *necessity of payment* while the latter rule was based merely on *the necessity of the service or supply furnished.* 197 U.S. at 187, 25 S.Ct. 415. See also Taylor v. Delaware & E. R. Co., 213 F. 622, 624 (2 Cir. 1914).

the rule. If the current revenues to which operations creditors are entitled, have never benefited or been diverted to the mortgagees, the operations creditors have no right to invade the interests of the mortgagees. The rule states that mortgagees shall not take any of the operating revenues until the operations creditors have been paid; if the mortgagees have never received any such revenues, they are not bound to restore any.[16]

The term "diversion" refers to a benefit to the mortgagees which is paid out of revenues which should have gone into the current expense fund. Such benefits to the mortgagees have been held to include payments of principal or interest, Fosdick v. Schall, supra, 99 U.S. at 253, 25 L.Ed. 339; Southern Railway Co. v. Carnegie Steel Co., supra, 176 U.S. at 295, 20 S.Ct. 347, and all increments in the mortgage security, such as capital improvements to mortgaged property, Fosdick v. Schall, supra; Southern Railway Co. v. Carnegie Steel Co., supra; Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U.S. 355, 369–370; 18 S.Ct. 657, 42 L. Ed. 1068 (1898), new acquisitions of property subject to the mortgage, Gregg v. Metropolitan Trust Co., 124 F. 721, 722 (6 Cir. 1903), aff'd 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905); In Re Minneapolis & St. Louis RR, (D. Minn. 1926) unreported memorandum at pp. 3408–3421 of Minneapolis & St. Louis RR Receivership Record, and, under circumstances distinguishable from that of the New Haven, payments of equipment trust obligations.[17] But when these benefits are paid, not out of earnings which qualified for the current expense fund, but out of what are called "free funds", then they are not diversions. See Gregg v. Metropolitan Trust Co., supra, 124 F. at 725. Such free funds have been held to include additional borrowings by the railroad,[18]

---

The two rules are also apparently inadvertently merged in 6A Collier, Bankruptcy (1965) § 9.13[5].

Some of the New Haven's creditors claim to qualify for a preference under the necessity of payment rule. As the railroad has been operating in reorganization for six years without payment of these claims, it is absurd to contend that it is necessary for continued operation of the railroad that the claims be paid. It may be that some of the New Haven's creditors occupied a sufficiently monopolistic position so that they could have forced payment; the fact is that they did *not. The necessity of payment rule is not based on considerations of equity but is rather a device for handling a threat to the continued operation of the railroad during reorganization. If there is no such threat, the rule is not applicable.*

16. Some claimants have argued that diversion is no longer required for corpus invasion after New York Dock Co. v. The Poznan, 274 U.S. 117, 47 S.Ct. 482, 71 L.Ed. 955 (1927). That case dealt with an entirely different situation; namely, services rendered to property while that property was in the custody of the court.

17. In Re Minneapolis & St. Louis RR, (D.Minn.1926), unreported memorandum at pp. 3408–21 of Minneapolis & St. Louis RR Receivership Record; Southern Railway Co. v. Carnegie Steel Co., 176 U.S.

257, 295, 20 S.Ct. 347, 44 L.Ed. 458 (1900) ("car trust debts"); Burnham v. Bowen, 111 U.S. 776, 782, 4 S.Ct. 675, 28 L.Ed. 596 (1884) ("fixed charges on railroad structures"); Gregg v. Mercantile Trust Co., 109 F. 220, 229 (6 Cir. 1901). The theory of these holdings is apparently that once all payments have been made, title to the equipment will pass to the railroad and hence the asset will become part of the mortgage security. See footnote 21 infra.

The mortgage security is also increased, some of the claimants argue, when the railroad pays off debts to other parties which were prior to mortgage liens. While such payments might as a practical matter improve the financial position of the mortgagees, they do not increase the mortgage security but merely restore some of the effectiveness of it for the mortgagees. Cf., St. Louis, A. & T. H. R. R. Co. v. Cleveland C., C. & I. R. Co., 125 U.S. 658, 676–677, 8 S.Ct. 1011, 31 L.Ed. 832 (1888) and Central Trust Co. of New York v. East Tennessee, V. & G. R. R., 80 F. 624, 625 (6 Cir.), holding interest payments to senior mortgagees are not diversions to junior mortgagees.

18. St. Louis, A. & T. H. R. R. Co. v. Cleveland C., C. & I. R. Co., 125 U.S. 658, 674–678, 8 S.Ct. 1011, 31 L.Ed. 832 (1888); Central Trust Co. of New York v. East Tennessee, V. & G. R. R. Co., 80 F. 624, 625–626 (6 Cir. 1897). It is ir-

proceeds from sales of mortgaged property,[19] and non-operating income.[20]

The six months creditors make several claims of diversion of current operating revenues to the mortgagees. They argue that allowances in the income account for depreciation are expenditures for capital assets and are, in effect, diversions from current earnings for the benefit of the mortgagees. Depreciation, however, does not create additions to assets or accessions to assets already held, but is a reflection of the very real economic fact that the assets are being consumed or wasted away in the process of keeping the railroad running and is actually a measure of the contribution of physical properties made by the mortgagees for this purpose. Therefore, to the extent of depreciation, operations creditors have no equitable claim on operating revenue; they have no equitable right to be protected from the phenomenon of depreciation. Contra, Flint v. Danbury & Bethel Street Ry. Co., 101 Conn. 13, 125 A. 194, 40 A.L.R. 1 (1924); also contra but allowing other off-setting liabilities, Guaranty Trust Co. v. Minneapolis & St. Louis R. R. Co., Receivership Record Vol. XIV, p. 8199 (D.Minn.1926). Allowance of depreciation is comparable to expenditures made merely to preserve and not to increase the mortgaged assets and as such are not diversions. Burnham v. Bowen, supra, 111 U.S. at 781–782, 4 S.Ct. 675. Improvements to repair and restore property are not diversions. St. Louis, A. & T. H. R. R. Co. v. Cleveland, C., C. & I. R. Co., supra, 125 U.S. at 667–678, 8 S.Ct. 1011. Diversion is the channelling of operating revenues for the enhancement of the railroad's mortgaged assets; depreciation is just the opposite—the steady consumption of the mortgagee's security by the operation of the railroad.

The six months creditors assert there were also diversions during the six months period through the payment of interest on the Harlem River Division mortgage and on the First and Refunding Mortgage. It is clear that these payments were made from the proceeds of Government guaranteed loans and were not made from current operating income. Likewise, payments during the six months period of principal and interest on certain bank loans, emergency loans and Flood and Shop loans, were not made from operating income which otherwise would have gone into a current expense fund, and in any event the payments did not benefit the mortgagees. A reduction in the Harlem River Division mortgage debt was made with the proceeds of the sale of mortgaged assets.

Some claimants have argued that there has been diversion in payment by the New Haven of substantial sums in fulfillment of its equipment trust and conditional sales obligations. However true this might be under normal conditions, in the circumstances under which the new Haven has operated since a time prior to the six months preceding the reorganization, there has been no income available for fixed charges. As the result of this, the interests of the Railroad which have been mortgaged to the bondholders are actually impaired by the payment of these obligations.[21]

relevant whether the loan proceeds went directly to benefit the mortgagees or replaced revenues which had benefited the mortgages. Central Trust Co. of New York v. East Tennessee, V. & G. R. R. Co., supra.

19. In Re Minneapolis & St. Louis RR. (D. Minn.1926), unreported memorandum at pp. 3408–21 of Minneapolis & St. Louis RR Receivership Record; FitzGibbon, The Present Status of the Six Months Rule, 34 Colum.L.Rev. 230, 245 (1934).

20. In Re Minneapolis & St. Louis RR. (D. Minn.1926), unreported memorandum at pp. 3408–21 of Minneapolis & St. Louis

RR Receivership Record. Cf., Gregg v. Metropolitan Trust Co., 124 F. 721, (6 Cir. 1903), aff'd 197 U.S. 183, 25 S.Ct. 415, 49 L.Ed. 717 (1905) [revenues accruing before six months period but collected during that period are "free funds"]. Other free funds of the New Haven's are the various grants in aid received from some of the states which the New Haven serves.

21. For example assume an acquisition of $3,000,000 in equipment under either equipment trust or conditional sale. The equipment obligation is for 15 years, providing for interest at 4.87%, payable

Witnesses for the Railroad's Trustees have testified that the sum of all payments of principal and interest and all improvements to, and new acquisitions of, mortgaged property are substantially less than the sum of all additional borrowings and sales of mortgaged property, and the court so finds. Not a single claimant has challenged the accuracy of this testimony at the hearing or in the briefs filed.

Not only has there been no diversion to the New Haven's mortgagees, but when one considers the Railroad's annual depreciation, for example, about $9,000,000 a year on way and equipment, it becomes clear that there has been a steady drain of security away from the mortgagees. Hence the New Haven's situation is precisely the opposite of the one for which the six months rule was devised. Instead of surplus earnings being applied to the enhancement of mortgaged assets, the expenses of operation have vastly exceeded income and have been paid out of corpus. Because there has been no diversion to the New Haven's mortgagees, no six months priority can be satisfied out of the corpus of the mortgaged property. And because the New Haven's current liabilities, which are mostly or completely administrative expenses prior to the mortgage lien,[22] exceed current assets, there are no assets other than corpus to satisfy such a priority. Therefore, on the facts as they now exist, no priority should be

semi-annually. It is assumed that the equipment has a useful life of 20 years, at the end of which there will be a 2% net salvage value.

In each year, the principal of the obligation will be reduced by $200,000; annual depreciation charges will be $147,000 and annual interest payments will average $84,282. The balance sheet accounting entries will be as follows: Upon acquisition, an asset of $3,000,000 is added, and a liability in equal amount is also created. As payments are made on principal, the balance sheet liability is reduced by $200,000 annually. Correspondingly, cash is also reduced by $200,000, plus the amount of interest paid. Each year the net book value of the asset is reduced by $147,000, reflecting the depreciation. On the income account, annual depreciation of $147,000 is taken as a charge against revenues. The interest payment is reflected as a fixed charge; it is deducted only *after* arriving at the figure designated "Income Available for Fixed Charges."

At the end of 15 years, principal payments will total $3,000,000, and interest payments will aggregate $1,264,234. The total cash outlay will thus be $4,264,234. At the end of 15 years, the equipment will be carried on the balance sheet at $795,000 with nothing owed thereon. Depreciation charges would have aggregated $2,205,000.

Under normal circumstances, the owner's equity would have benefited by $795,000, the difference between the amount of the principal payments and the depreciation (reflecting the decrease in value with use) over 15 years. However, cash outlays for interest of $1,264,234 were re- quired to reach this result. Normally, since there is income available for fixed charges, the owner of the enterprise does not suffer an impairment of his equity.

On the other hand, if there is a deficit in income available for fixed charges, the cash which must be paid as interest impairs the owner's equity. A deficit in this account means that after other expenses and charges for depreciation, revenues are insufficient to meet interest payments. In the above illustration cash of $4,264,234 was required to discharge the obligation. A non-cash charge to income was depreciation in the amount of $2,205,000. Accordingly, if there is a deficit in income available for fixed charges throughout the 15-year period, corpus will be impaired by the difference between $4,264,234 and $2,205,000, or $2,059,234. Assuming that the asset is worth its net book value of $795,000 after 15 years, the owner has suffered a net loss in equity of $1,264,234.

22. Some of the claimants have argued that no corpus invasion is necessary because six months claims are prior to certain other claims which are in turn prior to the mortgage liens. But whether the six months claims are put at the top or the bottom of the list of claims which are prior to mortgage liens is irrelevant, because proceeds from corpus available to the mortgagees will be reduced by the amount of the six months priority in either case. Where, as here, the mortgagees have received nothing to which the operations creditors are entitled, the mortgagees cannot be forced directly or indirectly to give up any of their security to benefit those creditors.

granted to any six months claimant of the New Haven.[23]

The claimants have urged the righteousness of their cause with considerable fervor and have asked the court to expand the equitable doctrine to permit them to recover. Such action would not be warranted. While no issue has been made in this case of the reliance for payment by the six months creditors (with the exception of the per diem claimants) on the Railroad's current earnings, rather than on its general credit, an examination by them of the Railroad's financial condition for the two years preceding the filing of the petition for reorganization would have disclosed to them that, if such a petition were filed, the chances of there being any surplus earnings were slight at best. It is more likely that reliance was in large measure placed upon the great efforts expended by management in late 1960 and early 1961 to keep the Railroad from going into bankruptcy through loans or grants by the Federal and state governments which resulted in substantial aid. Wide publicity was at that time given to these measures and assurance was given that bankruptcy had been avoided.

This is not to say that the six months creditors deserve no equitable consideration at all for contributing to the continued operation of the Railroad in the public interest but they are on notice of the existing and recorded mortgages and there is no reason to stretch the equitable doctrine further. See Kneeland v. American Loan & Trust Co. of Boston, 136 U.S. 89, 97–98, 10 S.Ct. 950, 34 L.Ed. 379 (1890). The New Haven Railroad in the interest of its creditors, its employees and the public should have petitioned in reorganization long before it did. The grave problems which have beset the reorganization would have been much less acute and infinitely more manageable if bankruptcy had not been put off until its cash was almost entirely depleted, credit was practically gone, maintenance was down and in all other respects the bottom was out of the barrel. At the very best, continued extensions of credit by operating suppliers assisted in this damaging delay and was of dubious benefit to either the public or the mortgagees. Compare Comment, Reorganization Under Section 77, 33 Colum.L. Rev. 834, 850 (1933):

> "It is likely that the major effect of the six months rule has been to enable an inefficient or dishonest management to remain in control long after it would otherwise have been superseded. It is not unlikely that through the abolition of the six months rule railroads would be compelled to seek reorganization at an earlier date, with corresponding benefits both to security holders and to the public served."

\* \* \* \* \* \*

> "Its origin is shrouded in some mystery, and its present status is a subject for disagreement by the experts. Originally designed to protect the small recent creditors, it now protects the steel companies and suppliers of rail ties. It is a fruitful source of litigation in every railroad receivership and a substantial encumbrance to speedy and just reorganization."

It is highly unlikely that the financial position of the New Haven will improve. If by some miracle it should develop that non-corpus assets are available, that corpus assets exceed in value the total

---

23. The total claims of the petitioners asserting priority under the six months rule (with the exception of the per diem claimants) amount to $4,670,300.91.

While no issue has been raised regarding these claimants on the score of their reliance upon current revenues, rather than upon the general credit of the railroad, for payment of their bills, such a question has developed concerning those claiming pre-reorganization per diem claims. The determination of that matter and any other question concerning the qualification of per diem claimants to come within the six months rule will be deferred. At present there is no current expense fund and the rule cannot operate in favor of any claimant. Moreover, any amounts which may be due on per diem claims cannot be determined until there is a final adjudication of pending litigation and administrative proceedings concerning correct per diem rates.

secured debt, or that operating revenues are diverted to the mortgagees, or become so large that there are surplus earnings, then the present claimants may, of course, renew their request for a priority.

Accordingly, the petitions seeking preferential treatment, including that of per diem claimants, are each and all denied but without prejudice to renewal upon a change of circumstances as above stated.

## APPENDIX

| Year | Operating Revenues | Operating Expenses | Taxes | Railway Operating Income or (Deficit) | Rents Net Debit | Net Railway Operating Income or (Deficit) | Income Available for Fixed Charges (Deficit) | Net Income or (Deficit) |
|---|---|---|---|---|---|---|---|---|
| 1958 | $149,550,961 | $125,435,142 | $11,756,329 | $12,359,490 | $16,215,037 | $ (3,855,547) | $ 5,048,457 | $ (4,276,639) |
| 1959 | 144,335,105 | 124,968,623 | 11,738,351 | 7,628,131 | 16,843,419 | (9,215,288) | (1,708,132) | (10,816,003) |
| 1960 | 134,044,436 | 121,063,593 | 12,174,340 | 806,503 | 17,431,834 | (16,625,331) | (7,729,729) | (14,698,640) |
| Jan.–June 1961 | 62,364,840 | 62,131,979 | 4,220,336 | (3,987,475) | 8,842,546 | (12,830,021) | (8,014,400) | (11,777,063) |
| July–Dec. 1961 | 64,837,655 | 60,324,078 | 4,051,505 | 462,072 | 7,209,346 | (6,747,274) | (3,937,463) | (7,772,626) |
| Total 1961 | 127,202,495 | 122,456,057 | 8,271,841 | (3,525,403) | 16,051,892 | (19,577,295) | (11,951,863) | (19,549,689) |
| 1962 | 126,176,221 | 115,835,382 | 8,767,358 | 1,573,481 | 13,087,919 | (11,514,438) | (5,082,913) | (12,741,495) |
| 1963 | 122,787,724 | 110,466,380 | 8,398,087 | 3,923,257 | 14,013,393 | (10,090,136) | (4,883,902) | (12,264,275) |
| 1964 | 121,597,371 | 115,204,331 | 9,030,688 | (2,637,648) | 14,418,614 | (17,056,262) | (8,325,923) | (15,262,688) |
| 1965 | 121,434,147 | 113,983,049 | 9,150,894 | (1,699,796) | 14,307,868 | (16,007,664) | (8,422,450) | (15,063,389) |

Depreciation Charges:

| Year | Depreciation Way | Depreciation Equipment |
|---|---|---|
| 1958 | $ 3,305,109 | $ 5,925,337 |
| 1959 | 3,342,554 | 5,887,828 |
| 1960 | 3,220,197 | 6,055,176 |
| 1961 Jan.–June | 1,602,262 | 3,164,897 |
| 1961 July–Dec. | 1,588,268 | 3,155,659 |
| 1961 Total | 3,190,530 | 6,320,556 |
| 1962 | 3,227,444 | 6,203,679 |
| 1963 | 3,038,365 | 6,087,287 |
| 1964 | 3,021,979 | 5,835,731 |
| 1965 | 3,026,146 | 5,766,671 |